**THE NATIONALIST MOVEMENT,**
Plaintiff,

v.

**CITY OF BOSTON, Defendant.**

**Civil Action No. 94–10825–GAO.**

United States District Court,
D. Massachusetts.

July 2, 1998.

Charles W. Rankin, Rankin & Sultan, Boston, MA, Richard Barrett, Learned, MS, Harvey A. Schwartz, Siobhan M. Sweeney, Schwartz, Shaw & Griffith, Boston, MA, for Plaintiff.

Susan M. Weise, Claudia B. McKelway, Krisna M. Basu, City of Boston Law Dept., Boston, MA, for Defendant.

*OPINION*

O'TOOLE, District Judge.

In this case the Court determines, on the evidence and for the reasons that follow, that the City of Boston wrongfully denied a parade permit to the plaintiff organization because of the opinions and beliefs it espouses. The City's application of its parade permit regulation denied the plaintiff rights guaranteed to it under the First and Fourteenth Amendments to the Constitution of the United States. In addition, the Court determines that the regulation is unconstitutional on its face, because it accords unlimited discretion to administrative officials to decide whether to grant or withhold a permit. Accordingly, the plaintiff is entitled to an award of damages and attorneys' fees, a declaratory judgment that the ordinance is unconstitutional, and an injunction against its enforcement or application.

This case was tried on the merits to the Court, sitting without a jury. Pursuant to Fed.R.Civ.P. 52(a), the Court makes the following findings of fact and rulings of law:

## I. FINDINGS OF FACT

The sponsors of the St. Patrick's Day/Evacuation Day parade traditionally held in South Boston canceled the 1994 parade rather than comply with an injunction issued by the Massachusetts Superior Court that would have required them to allow the "Irish–American Gay, Lesbian and Bisexual Group of Boston" to participate as an identifiable group. *See Irish–American Gay, Lesbian and Bisexual Group of Boston v. City of Boston,* 418 Mass. 238, 636 N.E.2d 1293, 1297 (1994), *rev'd sub nom. Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston,* 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995). The controversy over the parade came to the attention of Richard Barrett, the "First Officer" of the plaintiff the Nationalist Movement, a non-profit organization incorporated under the laws of Mississippi. Barrett decided to come to Boston to hold what he called in his testimony "a resurrected St. Patrick's Day Parade." His purpose was to "show the people that they could march in the street, with all the dignity and all the pomp and all the circumstance," despite the cancellation of the traditional parade. Trial Tr., vol. 1 at 27.

According to Barrett, the Nationalist Movement is "pro democracy and pro majority, which means we want a majority-ruled country. We take great exception to such things as what we would call favoritism for the few, sectionalism. We oppose anything that would tend to divide the country, divide the American people. One of our biggest platforms is we're calling for national voting by initiative and referenda. We want a consensus-governed nation." *Id.* at 21.

Others have a different view of the plaintiff organization. A letter circulated in April 1994 by the Mayor of Boston and representatives of the Anti–Defamation League and the Urban League of Massachusetts described the Nationalist Movement as "a group that deals in hatred; they target African–Americans, Jews, gay men, lesbians, Asian–Americans, and other minorities." Trial Ex. 15.

*The parade permit regulation*

A regulation of the Transportation Department of the City of Boston prohibits anyone from holding a "parade, procession or other organized formation of persons or vehicles" unless the City's Commissioner of Transportation has granted a permit for such event. Boston Transportation Department Regulations, Art. VIII ("Parades, Processions and Formations"). Trial Ex. 1. That regulation is at the center of the present controversy. Its full text is set out in Appendix A to this opinion. In brief, the regulation requires a person seeking to hold a parade on "any street, way, highway, road, or parkway under the control of the City" to make a written request for a permit, specifying the date and time for the parade, the sponsor, the formation point and proposed route, and the approximate number of participants. The Commissioner "shall issue such permit in all cases except where the time, place, and manner are not in conformity with" certain "Rules" set out in the regulation. In particular, the regulation provides:

 . . . .

2. No permit shall be issued authorizing a parade, procession, or formation under the following conditions:

 . . . .

 b. When the time, route, and size will disrupt the use of any street or any public place, or material portion thereof, which is ordinarily subject to great congestion of traffic and is chiefly of a business or mercantile character, except upon those holidays or Sundays when places of business along the route proposed are closed.

 c. When it is of a size or nature that requires the diversion of so great a number of police officers of the City to properly police the line of movement and the areas contiguous thereto, that allowing the parade or motorcade would deny reasonable police protection to the City.

Trial Ex. 1, Art. VIII.

Notwithstanding those prohibitions, the Commissioner is given authority, with the approval of a majority of the Boston Transportation Commission, to grant "[s]pecial permits for occasions of extraordinary public interest, not annual or customary, or not so intended to be, ... for any street or public place, and for any day and hour." In addition, the Commissioner has "the authority to modify the route, time, and place of a parade to facilitate crowd control in the interest of relieving congestion and promoting public safety, provided that the applicant's right of free speech is not denied thereby." Trial Ex. 1, Art. VIII § 2.

Apart from this regulation, there are no other rules or standards to guide the Commissioner's judgment about any of the matters entrusted to his discretion. The practice of the Transportation Department was to evaluate each permit application individually, essentially on an *ad hoc* basis.

### Application for a parade permit

Acting on behalf of the Nationalist Movement, Barrett wrote to the City's Transportation Commissioner on March 9, 1994, giving notice that the Movement intended to hold a parade and rally on May 7, 1994, in South Boston. The theme of the event was said to be "Neighborhood, Home, Family, and Country: Go, Southie, Go." He enclosed a map of the proposed route and gave the other information required by parade permit regulation. Trial Ex. 2.

On March 19, 1994, the Boston newspapers reported the plaintiff's proposal to hold the parade and rally. The timing was significant. The next day, March 20, was the day the traditional St. Patrick's Day/Evacuation Day parade would have been held if it had not been canceled. Over the next several days, the matter was the subject of newspaper reports. The tenor of the reports was that the Nationalist Movement was "not welcome" in Boston, and particularly in South Boston. Trial Ex. 29.

When Barrett had not received a response to his letter to the Transportation Commissioner, he wrote again on March 28, giving further details about the planned event. He also asked that the issuance of the permit be put before the City Council, so that the Movement might avail itself of all "administrative remedies." He further advised that if the permit were to be withheld, as the press reports were suggesting, the Movement would seek federal judicial intervention. Trial Ex. 3.

The Commissioner, Frank A. Tramontozzi, responded by a letter dated April 6, notifying Barrett that the application for a parade permit was denied "in its present form." He gave three reasons. First, the proposed parade would occur at a time "when a significant portion of the route, which is chiefly of a business character, is subject to great traffic congestion and commercial activity." Second, the City had "significant concerns relating to its ability to protect the participants, spectators, and the general public should the parade go forward at the location you have requested, given the timing of the proposed parade on a busy Saturday, and geographical factors such as South Boston's narrow streets, a very high housing and population density, and the height of Thomas Park" (where the rally would be held). Third, the Movement's application for a permit was not complete because it had not applied for "a separate street closing permit" that would be needed. The Commissioner offered to meet with Barrett or other representatives of the Movement "to determine a reasonable alternative time, place or manner ... for which the City would be willing to issue a permit." Trial Ex. 4.

The Movement sent a representative, Gerald McManus, to meet with city officials on April 11, but the meeting was postponed by the City. McManus was assaulted in City Hall by some demonstrators who were apparently waiting for him. The meeting was rescheduled for April 13 at Boston Police Headquarters.

Also on April 11, Barrett wrote to Tramontozzi, responding to the reasons the Commissioner had given for the denial of the parade permit. Barrett asserted that the traffic congestion and public safety reasons given by the Commissioner were insufficient under applicable federal constitutional principles. In particular, he contended that the regulation

was invalid under the First Amendment both on its face and as applied, the same argument he makes here. (He also requested a "street closing permit," in response to Tramontozzi's third stated reason for denial of the parade permit.) Trial Ex. 7.

Over the next few days, the parties engaged in negotiations to see if they could agree on a modification of the Movement's proposed parade and rally that would satisfy the City and lead to the issuance of a permit. McManus met with Richard Loring of the Transportation Department and a representative of the Boston Police on April 13 to discuss the matter, but no agreement was reached. The same day, Barrett wrote to Loring suggesting a minor modification of the route. Tramontozzi wrote Barrett on April 15 that the City was willing "to discuss any and all reasonable alternatives," but he reaffirmed the denial of the permit on the grounds of congestion and public safety. Trial Exs. 8, 9.

The City tried to persuade Barrett to agree to hold a rally on City Hall Plaza or the Boston Common, rather than in South Boston. Barrett insisted, however, that it was the Movement's purpose to hold a parade in South Boston along at least a part of the route of the traditional St. Patrick's Day/Evacuation Day parade, and that moving the event to a different location would interfere with the message intended to be conveyed by the parade. He expressed this intention in his April 13 letter to Loring: "As to the Parade route, the event is to provide an opportunity for St. Patrick's Day revelers (who, also, in this instance, declare their support the goals [*sic* ] of our Parade and ·our Program) to march along the traditional route which was aborted earlier this year. And, also, to support neighborhood through presence and speeches at the recent focus of pro-neighborhood activity: the South Boston High School. . . . West Broadway, the center of the traditional route, will, also, be the center of our Parade." Trial Ex. 8.

Barrett thereafter corresponded with the City's Corporation Counsel, Albert Wallis, and met with Wallis in Boston on May 4, three days before the event. Barrett and Wallis negotiated a change in the proposed route for the parade, reducing it to .6 of a mile, less than half the length of the originally proposed 1.3 mile route, and limiting it ·to largely residential, rather than business, areas. The proposal was reduced to writing, and Barrett signed it, noting that his agreement was without prejudice to the Movement's position that it was entitled to march on the original route, with or without a permit. Wallis left the room for a short while and came back to tell Barrett that the Mayor's office had rejected the agreement. On May 5, Tramontozzi wrote a final letter to Barrett, ·confirming .the denial of a permit, and no permit was issued. Trial Exs. 10, 13, 14.

Throughout these events, Barrett had maintained that he intended to hold the parade and rally even if a permit were denied. Accordingly, the Boston Police, the Transportation Department and other agencies made preparations for the events of May 7. Three days before the parade, representatives of various governmental agencies met to make contingency plans for any action made necessary by the parade. Among other things, special restrictions. were imposed forbidding on-street vehicle parking for streets in the area of the parade route on May 7. Arrangements were made to tow cars that were parked in violation of the ban. Street excavation permits were suspended from May 4 through May 8.

Boston Police Superintendent James Claiborne, who is Chief of the Bureau of Field Services, supervised police preparations. He began his planning in late March. Among other things, he oversaw an evaluation of the likelihood that the parade might provoke unrest or disturbances. In that connection, the police contacted officials in other jurisdictions where the Nationalist Movement has conducted parades and rallies. The information they received indicated that civil unrest had occurred on some occasions, usually caused by counterdemonstrators. Claiborne received no information that persons associated with the Nationalist Movement had initiated any disturbances in other cities.

Claiborne also became aware that counterdemonstrators were likely to be present at the South Boston parade. He had some

"public safety concerns" about the proposed event, because of the South Boston High School's "long history of being a site with racial confrontations within the City," Trial Tr. at 3–9, and because the counterdemonstrators who were expected to be present "had a long history of supporting, among other things, forced busing. And there [have] been incidents in the past in which the Emergency Mobilization Committee Against Racism and their associates have gotten into conflicts with the residents of South Boston." *Id.* at 3–11. He was not concerned about what supporters of the Nationalist Movement would do; rather, he testified that "the groups whose interaction that caused me the most concern were those of South Boston residents and the counterdemonstrators." *Id.* at 3–10. The police had heard reports that counterdemonstrators had said they would attempt to prevent the Movement supporters from marching. *Id.* at 3–25.

Notwithstanding these concerns, Superintendent Claiborne believed that the Boston Police would be able to provide adequate security both for the marchers and the public. Neither he nor, to his knowledge, anyone else in the Police Department ever told either the Mayor's office or the Transportation Department that the police would be unable to provide adequate security for the parade. Because there was a conflict in the evidence about this point, it is worth noting specifically that Claiborne was a credible witness, candid, straightforward and professional in demeanor. I credit Superintendent Claiborne's testimony in this regard, and I do not credit any suggestion in the testimony to the contrary. Significantly, Claiborne also testified that the police planning would have been essentially the same if a permit had been issued.

*The parade and rally*

On the morning of the parade, the streets were closed as planned. Six hundred Boston police officers were in the area, and an additional 200 state troopers stood by. Barricades were set up as a "checkpoint" outside the South Boston High School, monitored by the police, to separate the marchers from onlookers or counterdemonstrators. The police generally permitted anyone who wished to join the parade to pass through the checkpoint, but the physical arrangements nonetheless made it difficult for people to freely or spontaneously join the group.

Led by Barrett, the parade began about 1:00 p.m. on May 7. There were about 30 participants in the parade. The route taken by the marchers was the abbreviated one discussed between Barrett and Wallis on May 4. A formation of about 40 police officers on foot escorted the Nationalist Movement marchers, and an additional contingent of motorcycle officers forming a barrier between the paraders and anticipated counterdemonstrators. Finally, a third group of officers along with two or three patrol wagons followed the parade in case there was either the need to make arrests or to evacuate marchers for their own safety.

The police thus deployed accompanied the Nationalist Movement marchers the entire length of the parade, and in doing so, deliberately confined the marchers to the sidewalks, preventing them from parading in the streets. Claiborne testified he ordered the police to do so because the Movement lacked a permit for the parade. There was, however, no traffic on the streets, since traffic had been barred from the route early in the morning. As a result, while the Movement's parade was confined to the sidewalks, the police contingents themselves occupied the middle of the streets.

The deployment of the police in the manner described limited the ability of onlookers to see the parade and inhibited any interaction between the Movement paraders and the public, including the attempts of the marchers to distribute petitions. In addition, some persons who might otherwise have participated in the parade stayed away because of the controversy. McManus withdrew from participation because he had been previously assaulted as a result of his connection with the Nationalist Movement, and he was afraid to continue his participation. Another witness testified that he was kept from participating because he feared he would be arrested if he marched.

After the parade, the Movement supporters held a rally outside the South Boston

High School. After an invocation and playing of a recording of "The Star Spangled Banner," Barrett spoke for about 45 minutes. Another person read the Declaration of Independence. There was also a period for an "open microphone," during which any person who wanted to speak was given an opportunity to do so for a short time.

While there was a good deal of noise, including clapping and chanting, the rally did not engender any disturbances, and when it was over, it was disbanded peacefully. Throughout the day's events, the police made no arrests.

*Other parade permits*

In the Spring and Summer of 1994, the City, through Commissioner Tramontozzi, issued permits to other groups of varying sizes for parades to be held on Saturdays in various locations throughout Boston. Seventeen such permits are listed in Appendix B to this opinion. They included permits for Little League parades on major streets in East Boston, West Roxbury, Mission Hill, Roxbury and Dorchester, the Dorchester Landing Day Parade on major streets in Dorchester, a New England Bosnian Relief Committee march on major streets in the Back Bay, and the Boston Gay/Lesbian Pride Parade on major streets in the Back Bay and South End. These permits were for parades ranging in size from small to very large, and from relatively innocuous to potentially controversial.

During this same time period, the City also issued permits for parades on major streets to take place on weekdays. For example, a permit was issued to the Ancient and Honorable Artillery Company for a parade to begin at noon on June 6, 1994, proceeding through the streets of the downtown business district from Faneuil Hall to Copley Square.

The City has sometimes issued a permit with the restriction that it is for the "sidewalks only." Examples of such restricted permits are contained in Appendix C. There are no objective standards governing when the "sidewalks only" restriction should be imposed, and the evidence included permits that tended to show that events generally similar in "time, place and manner" were apparently treated differently. For example, the City granted a restricted "sidewalks only" permit for a "Save the Dream March" on Saturday, June 18, 1994, for 500 persons to march along Tremont, Charles, Beacon and Park Streets. On the other hand, the City granted an unrestricted permit for the "54th Massachusetts Volunteer Infantry & Abolitionist Parade" on July 16, 1994, for 200 persons to march in the streets along a route that started at Park Square, went through the financial district, and ended on Tremont, Park and Beacon Streets. These two events seem roughly similar in objective features, such as the time for the parade, the streets it would travel, and the number of participants, and it is not clear why one should have been restricted to sidewalks while the other was not.

## II. RULINGS AND CONCLUSIONS OF LAW

The plaintiff alleges causes of action under 42 U.S.C. §§ 1983 and 1985, both of which derive from the Civil Rights Act of 1871, sometimes called the "Ku Klux Klan Act." *See Griffin v. Breckenridge,* 403 U.S. 88, 98–99, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

■ Section 1983 permits an action for damages and other relief against any person who, acting under color of state law, deprives another person of rights, privileges or immunities secured by the Constitution and laws of the United States. A municipality may be liable under § 1983 for deprivations of rights that result from a municipal policy or custom. *See Board of County Comm'rs, Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1387–89, 137 L.Ed.2d 626 (1997).

Section 1985(3) provides an action for damages against persons who conspire to deprive another of equal protection of the laws. Although the plaintiff has referred to § 1985 in the complaint, only one defendant, the City of Boston, was sued, and there was no proof at trial of a conspiracy that would justify the invocation of § 1985.

Accordingly, the complaint is treated essentially as one for relief under § 1983. The complaint has five counts, but they all appear to rest on the same grounds: that the City

unlawfully deprived the plaintiff of its rights of freedom of speech and assembly guaranteed under the First and Fourteenth Amendments.

1. *The City applied the permit regulation so as to interfere with the plaintiff's rights*

■ The constitutional principles that govern this case are clear and settled. Public streets and parks "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens." *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 515, 59 S.Ct. 954, 83 L.Ed. 1423 (1939) (Opinion of Roberts, J.). Public "streets are natural and proper places for the dissemination of information and opinion." *Schneider v. New Jersey*, 308 U.S. 147, 163, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

■ Nevertheless, a municipality must have the right "to regulate the use of city streets and other facilities to assure the safety and convenience of the people in their use," because the "constitutional guarantee of liberty implies the existence of an organized society maintaining public order, without which liberty itself would be lost in the excesses of anarchy." *Cox v. Louisiana*, 379 U.S. 536, 554, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (citation omitted). Accordingly, the municipality may "Enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

■ "As regulation of the use of the streets for parades and processions is a traditional exercise of control by local government, the question in a particular case is whether that control is exerted so as not to deny or unwarrantedly abridge the right of assembly and the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Cox v. New Hampshire*, 312 U.S. 569, 574, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). In this case, that question is resolved against the City of Boston.

The evidence was unmistakably clear about two facts: First, in refusing to grant the Nationalist Movement the parade permit it applied for, the City treated it differently from other applicants for permits for parades or processions to be held under similar conditions of time, place and manner. And second, the nature and content of the Nationalist Movement's message was the predominant reason it was treated differently and had its permit request denied.

■ "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989). Under both the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.... Selective exclusions from a public forum may not be based on content alone, and may not be justified by reference to content alone." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972); *see also Niemotko v. Maryland*, 340 U.S. 268, 272, 71 S.Ct. 325, 95 L.Ed. 267 (1951). But that is what the City did in this case.

The City offered two reasons, both based on the language of the parade permit regulation, for why the permit was denied. The first reason was that "a significant portion of the route, which is chiefly of a business character, is subject to great traffic congestion and commercial activity." Trial Ex. 4, Tramontozzi letter of Apr. 6, 1994. This reason relied on that portion of the regulation that authorized the denial of a permit if "the time, route, and size [of the parade] will disrupt the use of any street ... which is ordinarily subject to great congestion of traffic and is

chiefly of a business or mercantile character." Trial Ex. 1, § 2(b).

As Appendix B to this opinion shows, the City commonly grants parade permits for parades to be held at midday Saturday on normally congested streets in areas of "business or mercantile character." At trial, Tramontozzi tried to rationalize the grant of those permits by distinguishing the congestion of the business district on West Broadway in South Boston from conditions at other places where parades were permitted by the City, such as Centre Street in West Roxbury where 950 Little Leaguers were permitted to parade just before noon two Saturdays before the plaintiff's proposed parade. The futility of that attempt betrays the indefensible nature of the "traffic congestion" justification for denying the plaintiff's application. The emptiness of the justification is also highlighted dramatically by the issuance of permits for a Saturday parade predicted to involve thousands of participants in a downtown district, in the case of the Boston Prayer Foundation Parade on June 25, and for a Saturday parade predicted to involve upward of 100,000 participants in the Back Bay and South End, in the case of the Boston Gay/Lesbian Pride Parade on June 11.

It is perfectly clear that the City did not interpret the regulation to require the denial of a permit whenever a parade would cause some level of interference with normal traffic and some consequential inconvenience to other users of the public streets. Every parade does that to some degree. Even the smallest Little League parade may keep traffic stopped at intersections for ten or twenty minutes as it passes by, hindering and delaying other travelers. Indeed, as the Gay/Lesbian Pride Parade permit shows, the City was willing in some cases to accept a fairly significant interference with normal traffic in order to accommodate the event. There is surely nothing wrong with that. What is wrong is for the City to grant the privilege to some applicants and deny it to others, making the decision by reference to who the applicant is or what the purpose of the parade is intended to be.

Even though Tramontozzi's letters seem to speak only of traffic interference in the literal, physical sense, it may be suggested that the regulation prohibits parades that "disrupt" the use of a street not merely in the simply physical sense of obstructing the passage of others, but in the broader sense of causing a disturbance. The "disturbance" argument is really another way of stating the City's second expressed reason for the denial of the permit, concern for public safety.

In his second letter outlining the reasons for the denial, Tramontozzi wrote:

> The City continues to have significant concerns relating to protecting the safety of the participant [*sic*], spectators and general public if the parade goes forward along the route you have proposed .... Further, the anticipation of the event has already spawned several tentative counter-events which would require simultaneous need for police deployment. In light of the above, the Police Department is unable to assure that there would be adequate police protection in the City of Boston during the time of this event.

Trial Ex. 9 at 3. In support of this position, Tramontozzi referred to that portion of the regulation authorizing the denial of a permit for a parade "that requires the diversion of so great a number of police officers of the City to properly police the line of movement ... that allowing the parade ... would deny reasonable police protection to the City." Trial Ex. 1, § 2(c).

Public safety is unquestionably a legitimate concern. But the factual premise of the Commissioner's assertion was false. It was not true that the Police Department was unable to assure adequate police protection either at the site of the parade in South Boston or elsewhere in the City. That assertion was, like the assertion about traffic congestion, a pretext.

■■ In any event, a municipality's legitimate concern for public safety does not automatically justify a refusal to permit a controversial group to present its ideas in public. The government may not assume that "every expression of a provocative idea" will lead to a disturbance of the peace. *Johnson*, 491 U.S. at 409, 109 S.Ct. 2533. Indeed, the Supreme Court has recognized that "a func-

tion of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Terminiello v. City of Chicago,* 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). Regulating protected expression on the basis of how listeners may react to it is not "content-neutral." *Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 134, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). Speech or expression cannot be forbidden "simply because it might offend a hostile mob." *Id.* at 135, 112 S.Ct. 2395. On the contrary, the fact that an opinion gives offense may be precisely a reason for giving it constitutional protection. *See Federal Communications Comm'n v. Pacifica Found.,* 438 U.S. 726, 745, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (Opinion of Stevens, J.).

 The anticipation of a hostile reaction does not permit the City to require that the plaintiff alter or muffle its intended expression any more than it permits the City to prohibit it. In this case, the City tried to persuade the Nationalist Movement to change the location of its parade and rally from South Boston to City Hall Plaza or the Boston Common. It was thought that either alternate location would be a less volatile environment and, in contrast to the streets of South Boston, either open space would be more conducive to effective crowd control. To change the location, however, was to change the character of the message. Barrett made it clear that the point he wanted to make was to hold a parade on at least part of the very route of the traditional St. Patrick's Day/Evacuation Day Parade. The *place* of the event was a substantive feature of the message.

 As a general matter, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider,* 308 U.S. at 163, 60 S.Ct. 146. Moreover, the Supreme Court has recognized that the specific place where a message is communicated may be important to the message and, consequently, of constitutional significance itself. *See City of Ladue v.*

*Gilleo,* 512 U.S. 43, 56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994) (right to display expressive sign on residential property). Not only may the location be an essential part of the message sought to be conveyed, but it may also be essential to communicating with the intended audience. In *Gilleo,* for example, the Court noted that a residential sign was a way of communicating directly with neighbors, "an audience that could not be reached nearly as well by other means." *Id.* at 57, 114 S.Ct. 2038. Similarly, it was the plaintiff's desire in the present case to communicate with residents of South Boston, and that could not be done as effectively by a rally on City Hall Plaza as by a parade through the neighborhood itself.

 This is not to say that a group like the plaintiff must always get exactly what it wants when it proposes a parade and need never compromise its plans. That is plainly not the law. *See Cox v. Louisiana,* 379 U.S. at 554–55, 85 S.Ct. 453; *Cox v. New Hampshire,* 312 U.S. at 574, 61 S.Ct. 762. However, a governmental attempt to force the group to change the place and manner of expression may be inseparable from an attempt to regulate the content of expression itself. When that is the case, as it was here, only the most imminent likelihood of serious danger—a likelihood that is clear and present—will justify governmental action to prevent or alter the expression. *See Johnson,* 491 U.S. at 409–10, 109 S.Ct. 2533; *Thornhill v. Alabama,* 310 U.S. 88, 104–05, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

The evidence established that the City's parade permit regulation was not applied in a "fair and non-discriminatory manner." *See Cox v. New Hampshire,* 312 U.S. at 577, 61 S.Ct. 762. Rather, other applicants whose parades seem to have been just as disruptive to traffic as the plaintiff's, and still others whose parades would present an opportunity for the expression of ideas that might similarly provoke fervent opposition, have met with official favor and have received their permits. The difference in treatment is not justifiable. For purposes of the First Amendment, the second Justice Marshall reminded us, "There is an equality of status in the field of ideas, and government must af-

ford all points of view an equal opportunity to be heard." *Mosley,* 408 U.S. at 96, 92 S.Ct. 2286 (citation and internal quotations omitted). In the present case, the City applied its permit regulation to deprive the plaintiff of its rights under the First and Fourteenth Amendments to the Constitution.

### 2. *The permit regulation is unconstitutional on its face.*

The City was able easily to apply the regulation in a discriminatory way because the regulation itself confers discretion on the Commissioner to determine when a parade will "disrupt" a street or when it requires police coverage that would "deny reasonable police protection" to the rest of the City. It also grants the Commissioner authority "to modify the route, time, and place of the parade ... in the interest of relieving congestion and promoting public safety." Finally, it grants the Commissioner, with the approval of a majority of the Boston Transportation Commission, authority to make an exception for "occasions of extraordinary public interest" and grant a permit, apparently notwithstanding considerations of traffic congestion or police coverage, for a parade on "any street" to be held at "any day or hour." Trial Ex. 1.

There are literally no limits to this discretion. The regulation itself has no definitions or standards to guide the judgment, for example, about how much "disruption" is too much. Nor are there any other written standards or guidelines. There do not even seem to be any generally followed "practices" or customary interpretations. When pressed at trial to articulate the standards by which applications are judged, Tramontozzi could only repeat that every application is considered on its particular merits. In other words, the decision whether to grant a permit is entirely *ad hoc.* A permit is granted if it seems like the right thing to do, and denied or modified if that instead seems appropriate. There are no benchmarks by which to judge objectively whether, for instance, a Little League parade on Centre Street in West Roxbury is the same or different from a Little League parade on West Broadway, or whether a Little League pa-

rade on West Broadway would be the same or different from a Nationalist Movement parade there. The Commissioner's discretion appears absolute.

A permit granting scheme may not validly vest such broad discretion in the authorities to grant or withhold permission to persons seeking approval of a parade or meeting. "[I]n the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). "Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare' ... of the community." *Shuttlesworth v. City of Birmingham, Alabama,* 394 U.S. 147, 153, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). In *Kunz v. People of New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951), the Court held invalid on its face an ordinance that prohibited public religious worship meetings on the city streets unless a permit had been obtained from the police commissioner. The ordinance amounted to an unconstitutional prior restraint on protected expression because it lacked "appropriate standards to guide [the police commissioner's] action." *Id.* at 295, 71 S.Ct. 312. In a companion case, the Court reaffirmed the principle that a license requirement constitutes "a prior restraint on freedom of speech, press and religion, and, in the absence of narrowly drawn, reasonable and definite standards for the officials to follow, must be invalid." *Niemotko,* 340 U.S. at 271, 71 S.Ct. 325.

The danger to freedom of expression inheres in the very existence of a licensing system which allows the broad use of discretion. "The power of the licensor ... is pernicious not merely by reason of the censure of particular comments but by reason of the threat to censure comments on matters of public concern. It is not merely the sporadic

abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion." *Thornhill,* 310 U.S. at 97, 60 S.Ct. 736.

It is no answer for the City to say that the regulation contains the proper constitutional phrases. The regulation provides that a permit shall be issued unless the "time, place, and manner" for the proposed parade warrant limitation. The mere invocation of the words "time, place, manner" does not serve to restrict or guide the exercise of the Commissioner's discretion. In effect, the words are no more than an injunction to "do the right thing." The regulation also says that the Commissioner's discretion to modify the "route, time, and place" for a parade is subject to the proviso "that the applicant's right of free speech is not denied." That phrase likewise adds nothing of substance. A regulation is always subject to that limitation.

▇ "A government regulation that allows arbitrary application is inherently inconsistent with a valid time, place, and manner regulation because such discretion has the potential for becoming a means of suppressing a particular point of view. To curtail that risk, a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth County,* 505 U.S. at 130–31, 112 S.Ct. 2395 (internal quotations and citations omitted). The regulation at issue here has none of those hallmarks; its undefined "standards" are broad, not narrow, and subjective, not objective.

▇ The relevant practical test is this: "If the permit scheme involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority, the danger of censorship and of abridgement of our precious First Amendment freedoms is too great to be permitted." *Forsyth County,* 505 U.S. at 131, 112 S.Ct. 2395 (internal quotations and citations omitted). This regulation flunks that test.

It might be suggested that the Commissioner should be given the presumption that he will act in good faith and will deny a permit only for sound reasons affecting the safety and convenience of the public. "But this is the very presumption that the doctrine forbidding unbridled discretion disallows." *Plain Dealer,* 486 U.S. at 770, 108 S.Ct. 2138. "The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *Id.* As noted above, the interpretation of this regulation is restricted by none of these means.

The burden imposed on the City by these principles is to draft a regulation that serves the legitimate government interests in maintaining order and safety while at the same time leaving no leeway for content-based restrictions as to who ought to be permitted to march, when and where. That it is not an impossible burden is proved by cases where it has been successfully carried. *See Nationalist Movement v. Cumming,* 92 F.3d 1135 (11th Cir.1996) (upholding content-neutral ordinance that prohibited all parades in business district on Saturday mornings).

The City points out that an attack on the facial validity of the regulation was rejected in an earlier decision by a judge of this Court. *Progressive Labor Party v. Lloyd,* 487 F.Supp. 1054 (D.Mass.1980). In that case, however, the principal arguments against the validity of the regulation were different from the argument advanced here. Moreover, the Supreme Court has decided a number of significant cases bearing on the issues in the present case since 1980, when *Progressive Labor Party* was decided, such as *Perry Educ. Ass'n* (1983), *Plain Dealer* (1988), *Johnson* (1989), *Forsyth County* (1992), and *Gilleo* (1994). To the extent there is any conflict between those cases and the Court's resolution of the questions presented in *Progressive Labor Party* (and the fact or extent of any conflict is debatable), this Court must be guided by the Supreme Court precedents, rather than by its own prior rulings.

The Boston Transportation Department parade permit regulation vests too much discretion, without appropriate limits or standards, in the administrator passing on the applications for permission to use the public

streets and parks. Its character as a prior restraint on speech is not mitigated by narrow, objective or definite standards of interpretation and application. It is, therefore, invalid on its face as repugnant to the First Amendment.

### III. POSTSCRIPT

There is irony in this case for each side. For the City, it is ironic that all the official efforts to discourage and interfere with the Movement's parade had the opposite effect of magnifying the attention given to the event. In the past, it was suspected that some authors secretly longed to have their works "banned in Boston" because of the great publicity that attended such a proclamation. In the present case, the city officials behaved like a latter-day Watch and Ward Society guarding against offensive political opinions, and they fell into the same public relations predicament as their forebears. City officials prevented the plaintiff from presenting its message as it wanted, but in doing so, wittingly or not, they helped the plaintiff to get plenty of television coverage and front-page headlines. Moreover, the City's abuse of the discretion available under the permit regulation has led, by this case, to the invalidation of that regulation. Perhaps its facial invalidity would not have been presented for determination if officials had more properly exercised the discretion the regulation allowed them.

For the Nationalist Movement, the irony is more sublime. When it sought to hold its parade, the Movement found itself opposed by a prevailing community opinion that was decidedly unwelcoming. It was ultimately able to win its point here by relying on constitutional text and precedent devised to protect the rights of minorities against abuse from the politically powerful. Not insignificantly, much of the law that protects the plaintiff's rights here developed as a result of the courage of the pioneers of the civil rights movement of the 1950's and 1960's, many of whom faced a far more hostile reception than what the plaintiff experienced.

In recent years, the plaintiff has made its own contribution to the body of precedent supporting freedom of expression against majoritarian encroachment and, in doing so, has advanced the causes of all minority voices that seek a hearing from a sometimes inattentive and sometimes antagonistic majority. This case is another in which the "pro-majority" Movement has won a victory for the rights of minorities.

### IV. REMEDIES

#### A. Damages

■■■ The plaintiff is entitled to compensatory damages for injuries suffered as a consequence of the City's abridgement of its constitutional rights. The only evidence of monetary harm was that Barrett had expenses in coming to Boston earlier, and staying longer, than he would have if the permit had been issued without controversy. His testimony was that he incurred additional expenses of $700. The City does not contest that testimony.

■■■ The plaintiff is not entitled to compensation for the fact of the constitutional violation itself. *Memphis Community School Dist. v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). Punitive damages may not be assessed against the City. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247; 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

There was no other evidence of monetary damage to the plaintiff. Accordingly, the plaintiff shall be awarded $700 in compensatory damages, together with prejudgment interest at the federal rate from May 7, 1994.

#### B. Declaratory Relief

The Court adjudges and declares that the regulation of the Boston Transportation Department entitled "Parades, Processions and Formations" is invalid as repugnant to the First Amendment to the Constitution of the United States.

#### C. Injunctive Relief

A permanent injunction shall enter restraining and enjoining the defendant from enforcing the present regulation of the Boston Transportation Department entitled "Parades, Processions and Formations."

D. *Attorneys' Fees*

As the plaintiff has prevailed in this action, it shall be entitled to an award of reasonable attorneys' fees. 42 U.S.C. § 1988. Any application for fees shall be made within fourteen days of the docketing of this opinion.

## APPENDIX A

### BOSTON PARADE REGULATION

No person shall take part in any parade, procession or other organized formation of persons or vehicles, other than a funeral procession or a picket line, in or upon any street, way, highway, road, or parkway under the control of the City unless the Commissioner of Transportation has granted a permit for such parade, procession, or formation. The Commissioner of Transportation shall issue such permit in all cases except where the time, place, and manner are not in conformity with the Rules set forth below, or where the permit would conflict as to time or place with a permit previously issued. No fee shall be charged for any such permit.

1. The written request for the permit shall be filed with the Commissioner of Transportation at least seventy-two hours prior to the occurrence and should include the following:
 a. The date and starting time.
 b. The name, address, and telephone number of the applicant and name of the organization involved.
 c. The formation or assembly area and time therefor.
 d. The route of the parade or motorcade and what portions of the streets traversed may be occupied by such parade or motorcade.
 e. The approximate number of people and vehicles in the parade or motorcade.

2. No permit shall be issued authorizing a parade, procession, or formation under the following conditions:

 a. When the sole purpose is advertising any product, goods, wares, merchandise, event, or is designed to be held for private profit.

 b. When the time, route, and size will disrupt the use of any street or any public place, or material portion thereof, which is ordinarily subject to great congestion of traffic and is chiefly of a business or mercantile character, except upon those holidays or Sundays when places of business along the route proposed are closed.

 c. When it is of a size or nature that requires the diversion of so great a number of police officers of the City to properly police the line of movement and the areas contiguous thereto, that allowing the parade or motorcade would deny reasonable police protection to the City.

Special permits for occasions of extraordinary public interest, not annual or customary, or not so intended to be, may be granted by the Commissioner of Transportation for any street or public place, and for any day or hour, with the approval of a majority of the Boston Transportation Commission.

The Commissioner of Transportation shall have the authority to modify the route, time, and place of a parade to facilitate crowd control in the interest of relieving congestion and promoting public safety, provided that the applicant's right of free speech is not denied thereby.

## APPENDIX B
## SATURDAY PARADE PERMITS GRANTED MARCH—JULY 1994

| Saturday Parade Permits | Group | Time and Number of Participants | Route |
|---|---|---|---|
| March 19, 1994 Permit # 3381 | New England Bosnian Relief Committee | 2:00 PM 1000–2000 | Commonwealth Ave., Gloucester St., Boylston St., Charles St., Beacon St., Bowdoin St., Cambridge St. to City Hall |
| April 23, 1994 Permit # 2403 | East Boston Little League Ass'n | 11:00 AM 200–250 | Saratoga St., Bennington St. through Central Sq., Meridian St., to Maverick Sq. |
| April 23, 1994 Permit # 2429 | Parkway Little League | 11:30 AM 950 | South St., Centre St., Spring St., Gardner St., Baker St. |
| April 30, 1994 Permit # 3397 | Allston Little League | Noon 160 | Holton St. Fern St., Franklin St., N.Harvard St., Spurr St., Western Ave. into Smith Field |
| April 30, 1994 Permit # 3398 | Mission Hill Little League | Noon 100 | St. Alphonsus St., Smith St., Parker St., Tremont St., Brigham Cir., Huntington Ave., Wait St., Pequot St., Calumet St. to Parker Hill Ave., to Killilea Field |
| May 7, 1994 Permit # 2844 | Wake Up the Earth Parade | 11:00 AM 1st Group: 300 2nd Group: 50–100 | 1st Group: Centre St., Lamartine to T Station. 2nd Group: Washington Park, MLK Blvd., Washington St. Boylston St., Lamartine St. |
| May 14, 1994 Permit # 2847 | Roberto Clemente Baseball Program | 9:30 AM 250 | Dudley St., E.Cottage St., Cliffton St., Burell St., Norfolk St. to Clifford Park |
| June 4, 1994 Permit # 2861 | Dorchester Landing Day Parade | 10:30 AM 150 | Dorchester Ave., Savin Hill Ave. to Savin Hill Park |
| June 4, 1994 Permit # 2983 | Roxbury–North Dorchester Community Youth League | 11:00 AM 100—150 | Blue Hill Ave., Grove Hall, Warren St., MLK Blvd., Washington St., Malcolm X Park |
| June 11, 1994 Permit # 2448 | Boston Gay/Lesbian Pride | Noon 100,000–110,000 | Dartmouth/Boylston St., Clarendon St., Columbus Ave., Tremont St., Berkeley St., Boylston St., Charles St., Beacon St., Arlington St. |
| June 11, 1994 Permit # 2829 | Love Unlimited Outreach Ministries | Noon 700 | 1st Group: Blue Hill Ave. to Franklin Fld. Park. 2nd Group: Blue Hill Ave. at Quincy Ave., to Franklin Fld. Pool |

| Saturday Parade Permits | Group | Time and Number of Participants | Route |
|---|---|---|---|
| June 11, 1994 Permit # 2990 | Red Sox Rookie & RBI Leagues | 9:00 AM 900 | Brookside Ave., Montibello St., Washington St., Columbus Ave., Ritchie St. |
| June 11, 1994 Permit # 2880 | Kick Off of World Cup Soccer | 11:00 AM 200 | City Hall Plaza, Cambridge St., Sudbury, Congress, North into Faneuil Hall Marketplace |
| June 25, 1994 Permit # 2989 | Boston Prayer Foundation, Inc. | 11:00 AM 10,000 | City Hall Plaza, Tremont St., Boylston St., Charles St. to Boston Common at Beacon St. |
| July 2, 1994 Permit # 2449 | 17th Annual "Festival of Chariots" | Noon 150 | Boylston St., Charles St., Beacon St., Park St., Tremont St., to Boston Common |
| July 9, 1994 Permit # 2991 | "Remember the Day" March | 10:00 AM 250–300 | Dudley Sq., Warren St., Blue Hill Ave. into Franklin Park |
| July 16, 1994 Permit # 30?0 | 54th Mass. Volunteer Infantry & Abolitionist Parade | Noon 200 | Park Sq., Boylston St., Essex St., Chauncy St., Summer St., High St., Federal St., Franklin St., Washington St., School St., Tremont St., Park St., Beacon St., to State House |

## APPENDIX C
## SATURDAY "SIDEWALK ONLY" PARADE PERMITS GRANTED, APRIL—JULY
### 1994

| Saturday Date and Permit Number | Organization | Time and Number of Participants | Route (Sidewalk Only) |
|---|---|---|---|
| April 30, 1994 Permit # 2881 | CEASE (Citizens to End Animal Suffering and Exploitation) | Noon 150 | Commonwealth Ave., Beacon St., Mass. Ave., to Cambridge |
| May 21, 1994 Permit # 2848 | Center House Walk-a-thon | 11:00 AM 100 | Cambridge St., Charles St., Esplanade, Sherborn Bridge, Kenmore Sq., Comm. Ave., Charles St., Tremont St., Court St., Congress St., New Chardon St., Bowker St. |
| June 18, 1994 Permit # 2967 | Save the Dream March | 11:00 AM 500 | New Dudley St., Tremont St., Charles St., Beacon St., Park St. |
| June 25, 1994 Permit # 2996 | Glad Tidings Church Girls Brigade Walk | 11:00 AM 100 | Lithgow St., Washington St., Brent St., Talbot Ave ., Washington St. |
| June 25, 1994 Permit # 2831 | 4th Annual Prenatal Walk | 11:00 AM 150 | Morton St., Police Station, Blue Hill Ave. to Franklin Field Park |