**NEW ENGLAND REGIONAL COUNCIL OF CARPENTERS, Plaintiff,**

v.

**MASSACHUSETTS PORT AUTHORITY, et al., Defendants.**

**No. Civ.A. 98–12538–DPW.**

United States District Court, D. Massachusetts.

Sept. 15, 2000.

Christopher N. Souris, Krakow & Souris, Boston, MA, for New England Regional Council of Carpenters, Plaintiff.

Robert J. Cordy, Jason Levy, Steven W. Kaste, McDermott, Will & Emery, Boston, MA, for Massachusetts Port Authority, Peter Blute and Joseph M. Lawless, Defendants.

### MEMORANDUM AND ORDER

WOODLOCK, District Judge.

A labor union brings this § 1983 action against a port authority and its officers

seeking declaratory and injunctive relief to end limitation of expressive activity on government property. The port authority flatly bans leafletting on restricted port authority property and prohibits leafletting on public sidewalks in front of port authority property without permission. The plaintiff contends the regulations violate its First Amendment speech rights. The port authority counters that the pattern of regulation has in the past involved reasonable time, place and manner controls necessary to preserve the function of the properties. In response to concerns regarding assurance that future regulation will not be subject to unbridled discretion, the port authority during the course of this litigation implemented written regulations. The parties have filed cross motions for summary judgment. I will grant the port authority's motion, finding that the port authority has committed no past constitutional violations and that the port authority has adopted a facially constitutional permit scheme for the future.

## I. BACKGROUND

### A. The Parties

Plaintiff New England Regional Council of Carpenters (NERCC) is a labor organization representing carpenters from local unions throughout New England that are affiliated with the United Brotherhood of Carpenters and Joiners of America, AFL—CIO. Its principal place of business is in Boston, Massachusetts.

Defendant Massachusetts Port Authority (Massport) is a public instrumentality chartered by the Massachusetts Legislature. Its principal place of business is in Boston, Massachusetts. Also named as defendants are the Executive Director of Massport, sued solely in an official capacity, and the Director of Public Safety of Massport, who is also sued solely in his official capacity.

### B. The Stage for the Dispute

Massport is the owner of extensive property along the harbor in Boston. The specific sites forming the stage for this dispute are the Fish Pier, which juts into the Boston Harbor at the intersection of Northern Avenue and D Street, and the Northern Avenue sidewalks and crosswalks directly in front of the World Trade Center (WTC), which sits atop Commonwealth Pier just west of and parallel to the Fish Pier.[1]

### 1. The Boston Fish Pier

The Boston Fish Pier was built by the Commonwealth between 1910 and 1915 to provide a location for the Boston fishing fleet to bring its daily catch for auctioning, processing, and distribution. The property was leased to the Boston Fish Market Corporation (BFMC) by the Massachusetts Board of Harbor and Land Commissioners. With the decline of the fish industry over time, the BFMC relinquished its lease during the 1970s to Massport, a successor of the Commissioners. Massport refurbished the facilities and continues to operate it as a commercial fishing center for the unloading, processing, and auctioning of fish.

An iron fence running the width of the pier sets the pier off from the sidewalk. Passing through the gates on either side one encounters parking areas bisected by the roadway. Directly inside the gate is a brick guardhouse upon which a large sign states "Private Property: No Trespassing." The guardhouse is staffed with Massport Port Officers. The Port Officers are instructed to stop all vehicles entering the pier and inquire as to the nature of their business and the approximate length of time of their business on the pier. Furthermore, individuals parking on the pier must stop at the gate and show a pass or obtain a temporary permit.

The primary structures on the Fish Pier are two long three-story buildings, which run the length of the pier, and the Exchange Conference Center (ECC), formerly known as the Fish Exchange, which abuts the harbor along the terminus of the

---

1. A map of the area is attached as Appendix A.

pier at the end of the roadway between the long buildings. The water or dock sides of the long structures are used by fishing vessels for offloading, refueling, and repair purposes. A loading platform facing inward runs the length of the two long structures on the roadway side. The first and second floors of the three-story long buildings are leased principally to various fish wholesalers for their processing operations and sales space. Substantial commercial truck traffic, for the delivery of seafood products off-site, flows in and out of the pier.

The third floors of each of the two long structures have been converted into office space for Massport. Additionally, space has been leased to private, non-fish related entities including a well known seafood establishment, the No–Name Restaurant; a sandwich shop; two law offices with an admiralty speciality; a business that compiles and sells sports statistics; and the New England Israeli Chamber of Commerce.

Located at the end of the pier is the ECC which was renovated in 1995 and converted into a conference, meeting, and event center. The ECC contains a number of conference rooms for rent to the general public, in addition to a few Massport offices. The ECC also houses exhibits on the Port of Boston.

Since its renovation, the ECC has been managed privately by World Trade Center Boston pursuant to a management agreement with Massport. The management company rents rooms for meetings and functions for a fee, and arranges for catering and valet parking services. The ECC can handle events involving up to 175 people. Two parking areas for the ECC, each with ten spaces for parking, are located on either side of the ECC. The ECC also has an additional 25 spots that it can use in the parking areas located just inside at the entrance to the pier. Overflow parking is available on various lots off the pier.

## 2. The World Trade Center

A short distance away from the Fish Pier on the adjacent Commonwealth Pier sits the WTC. The WTC is managed by a private commercial real estate manager pursuant to a long-term lease. In addition to being an office building, the WTC is the site of numerous conventions, trade shows, and other special events throughout the year. The main entrance to the WTC is along Northern Avenue. Buses carrying visitors to and from the WTC stop on Northern Avenue directly in front of the WTC's entrance.

## C. Massport's Policy on Leafletting

Massport does not permit handbilling, picketing, or any other form of demonstrative activity on the Fish Pier proper. A Massport regulation states that port properties not open to the general public are restricted, and prohibits those without official business from entering without Massport's prior permission. 740 CMR 3.02(2). Other Massport regulations prohibit loitering and the posting, distribution, or display of "signs, advertisements, circulars, printed or written matter." 740 CMR 3.02(3) and (5). Accordingly, Massport has limited leafletting, picketing, and other demonstrations directed to activities on the Fish Pier to the sidewalk on Northern Avenue located at the entrance to the pier.

Massport's policy and practice with respect to sidewalks on Northern Avenue, including in front of the WTC, has been to require those who wish to picket, handbill, or otherwise demonstrate to first obtain a permit from Massport's Public Safety Office.[2] While there have been no written guidelines setting out this policy, Massport submitted in evidence a description of what permit applicants are required to supply. Massport requires permit applications to supply the name of the group or individual applicant, the name of a contact person and the location, dates, and times

2. Massport owns Northern Avenue and the surrounding sidewalks subject to a 1985 settlement agreement with the City of Boston pursuant to which Massport agrees to maintain Northern Avenue as a public way.

that the applicant wishes to conduct its activities. No information is requested concerning the content or purpose of the expressive activities. Massport asserts that it has approved all permit requests, placing restrictions only as appropriate to ensure public safety. The record does not indicate that any permits to leaflet on the sidewalks of Northern Avenue have ever been denied.

### D. The Leafletting Episodes

#### 1. Leafletting in Front of the World Trade Center

During the week of November 17, 1998, a construction industry trade show called "Build Boston" was held at the WTC. Build Boston is an annual event consisting of meetings, presentations, and displays that attracts large numbers of professionals, contractors, vendors, and others involved in the construction industry. NERCC learned that John Tocci, president of Tocci Building Corporation which is a construction industry contractor, was scheduled to address a gathering at Build Boston on November 17, 1998. NERCC wanted to publicize its grievances with Tocci, namely that Tocci Building Corporation pays its carpenters substandard wages and benefits, at the Build Boston event because of the high concentration of individuals involved in a variety of aspects with the construction industry. Tocci is a member of the Massport Advisory Board.

On November 17, 1998, without obtaining a permit, approximately thirteen NERCC members attempted to distribute leaflets at various locations around the WTC. Shortly after the union members began leafletting they were told by a security officer that they would have to leave or they would be arrested. Massport's Director of Public Safety told the state police to instruct the leafletters to stop their activities and obtain a permit. The leafletters stopped distributing leaflets and moved to an area across Northern Avenue from the WTC while the union attempted to obtain a permit from Massport.

Counsel for the union contacted the Public Safety Director sometime before noon and advised him that union members had been threatened with arrest for distributing leaflets in front of the WTC without a permit. The Director informed counsel that Massport requires a permit for leafletting. NERCC's counsel then promptly telecopied a permit application to the Director. At approximately 4 p.m. the Director issued the permit. The permit limited the number of leafletters to six, three on each side of the sidewalk at the lower level entrance to Northern Avenue from 9 a.m. to 5 p.m. The permit instructed that "[a]t no time will organizers block or impede the normal flow of pedestrian or vehicular traffic."

#### 2. Attempt to Leaflet in Front of the ECC

NERCC obtained information that the Tocci Building Corporation had made arrangements to hold a company holiday party at the ECC on the afternoon and evening of Wednesday, December 16, 1998. NERCC wanted to distribute leaflets to persons attending the Tocci event. On Thursday, December 10, 1998, NERCC telecopied a request to the Director's office for a permit for two persons at each entrance to the ECC itself to distribute leaflets for this time period. On Friday, December 11, 1998, the Director prepared two drafts of the permit, both of which limited leafletting to the entrance of the pier at Northern Avenue. NERCC's counsel learned on that day that the permit had been approved but only for leafletting at the Northern Avenue entrance. NERCC's counsel responded that the leafletters wanted to be located in front of the ECC. By late afternoon on Monday, December 14, 1998, the Director had still not issued the permit.

### E. Course of Proceedings

On December 14, 1998, NERCC filed its complaint in this action. NERCC simultaneously filed a motion for a temporary restraining order and a preliminary injunction to proceed unabated with leafletting in front of the ECC. The union subsequently

withdrew its motion for a temporary restraining order. NERCC then filed an amended complaint seeking injunctive and declaratory relief against Massport for violation of its First Amendment rights by requiring persons to obtain a permit before distributing handbills on public sidewalks (Count I); by implementing a permit requirement for handbilling on public sidewalks on Massport property that is unwritten, not based on articulated standards or objective factors, establishes no time limits on responses to applications, provides no procedure for review of decisions on applications, and which is subject to the discretionary judgment of Massport (Count II); by threatening union members with arrest for leafletting without a permit and by forcing them to cease their handbilling activities (Count III); and by failing to act in a timely manner on its December 10 permit application (Count IV).

NERCC's complaint essentially presents two issues for resolution. First, whether Massport's total ban on leafletting on the Fish Pier impermissibly restricts plaintiff's free speech rights in violation of the First Amendment. Second, whether Massport's policy requiring prior approval to distribute leaflets on sidewalks in front of its property is an impermissible prior restraint in violation of the First Amendment.

## II. SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one which has the "potential to affect the outcome of the suit under applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996). A genuine issue is "one

that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990) (citations omitted).

Therefore, to succeed on a summary judgment motion, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). In order to preclude summary judgment, the nonmoving party must submit "sufficient evidence supporting the claimed factual dispute to require a choice between the parties' differing versions of the truth at trial." *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (internal quotations and citations omitted). Because the parties have filed cross-motions for summary judgment, I must evaluate each motion separately, being careful to draw inferences against each movant in turn. *El Dia, Inc. v. Colon*, 963 F.2d 488, 492 (1st Cir.1992).

### B. Massport's Flat Ban on Leafletting on the Fish Pier

Massport's absolute ban on leafletting on the Fish Pier, including the area around the ECC, implicates the First Amendment because the port authority is a public agency[3] and consequently its property is government property. Constitutional interests were put in dispute by Massport's denial to NERCC of permission to leaflet in front of the ECC. However, it is well settled that the government "need not permit all forms of speech on property that it owns and controls." *International Soc. for Krishna Consciousness, Inc., v. Lee* (ISKCON), 505 U.S. 672, 678, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992); *see also U.S. Postal Service v. Council of Greenburgh Civic Assn's*, 453

**3.** Massport is a "purely public corporation for public purposes—an arm of the State—analogous to a municipal corporation." *Opinion of* *the Justices*, 334 Mass. 721, 735, 136 N.E.2d 223 (1956).

U.S. 114, 129, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981). The right of access to government-owned property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983).

### 1. Public Forum Analysis

■ The Supreme Court has identified three distinct categories of government property: traditional public fora, designated public fora, and nonpublic fora. *Perry*, 460 U.S. at 45–46, 103 S.Ct. 948. Traditional public fora are places that "by long tradition or by government fiat have been devoted to assembly and debate." *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Examples of traditional public fora are streets, sidewalks, and parks—places which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id.* (quoting *Hague v. CIO*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)). The government's ability to restrict speech in a traditional public forum is very limited, and depends on whether the speech restriction is content-based or content-neutral. A content-based restriction must be "necessary to serve a compelling state interest" and must be "narrowly drawn to achieve that end." *Perry*, 460 U.S. at 45, 103 S.Ct. 948. Content-neutral time, place, and manner restrictions on speech are upheld if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

■ The designated public forum is one which "the state has opened for use by the public as a place for expressive activity." *Id.* In determining whether the government intended to create a designated public forum, an examination of both policy and practice is required. *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 802, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985). A designated public forum is not created "whenever members of the public are permitted freely to visit a place owned or operated by the Government." *Greer v. Spock*, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976). The decision to create a public forum must instead be made "by intentionally opening a nontraditional public forum for public discourse." *Cornelius*, 473 U.S. at 802, 105 S.Ct. 3439. "Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Perry*, 460 U.S. at 46, 103 S.Ct. 948; *accord ISKCON*, 505 U.S. at 678, 112 S.Ct. 2701.

■ Public property which is not by tradition or designation a forum for public communication is governed by different standards. *Perry*, 460 U.S. at 46, 103 S.Ct. 948. The government has far greater latitude to restrict protected speech in nonpublic fora. *Hawkins v. City of Denver*, 170 F.3d 1281, 1287 (10th Cir.1999). "In addition to time, place and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. 948. For a court to uphold speech restrictions as reasonable, the restriction "need not be the most reasonable or the only reasonable limitation." *ISKCON*, 505 U.S. at 683, 112 S.Ct. 2701. Furthermore, "[i]n contrast to the public forum, a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Cornelius*, 473 U.S. at 808, 105 S.Ct. 3439.

■ Based on a review of the record, I conclude that the Fish Pier is a nonpublic forum. The Fish Pier does not begin to approximate a traditional public forum. The roadway stretching down the middle of the pier and the elevated sidewalks on

either side are not through routes; they lead only to pier facilities themselves. *See Chicago Acorn v. Metro. Pier & Exposition Auth.*, 150 F.3d 695, 702 (7th Cir.1998) ("the pier itself is a discrete, outlying segment or projection of Chicago rather than a right of way.") Rather than being a traffic artery, the service street and elevated sidewalks are internal to the pier, without the characteristics of public streets and sidewalks open to expressive activity. *Cf. U.S. v. Kokinda*, 497 U.S. 720, 727, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990).

■ Nor does the Fish Pier fit the description of a designated public forum. Massport has not opened the pier either in policy or practice for public expressive activity. Massport operates the Fish Pier as a restricted area for industrial purposes and limited commercial activity. A sign at the entrance to the pier alerts the visitor that the pier is "private" property. Massport regulations prohibit loitering and the posting, distribution and display of signs, circulars, printed or written matter—indicating that Massport has not opened the pier to expressive activity. To be sure, the No–Name Restaurant and other private enterprises are open to the public, but publicly owned and operated property does not become a public forum because members of the public are permitted to come and go. *ISKCON*, 505 U.S. at 686 (O'Connor, J., concurring). The requirement that individuals parking on the pier must stop at the gate to show a pass or obtain a temporary permit further demonstrates that Massport has taken affirmative steps not to open the Fish Pier for public discourse.[4]

### 2. Evaluation of the Ban in a Nonpublic Forum

■ Because the Fish Pier does not constitute a public forum by tradition or designation, it is a nonpublic forum. Government property that is neither a traditional nor designated public forum may be subjected to greater restriction on expression. The more restricted world of the nonpublic forum, however, is not necessarily a silent world, devoid of expressive activity. Restrictions on protected speech must still be examined. In *ISKCON*, the Court applied a standard of reasonableness to content neutral regulations on free speech in nonpublic fora. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Massport's flat ban on leafletting is just such a content neutral regulation and, thus, is to be evaluated according to the reasonableness standard elaborated in *ISKCON*. Accordingly, I will consider whether the policy banning leafletting is "reasonable" and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46, 103 S.Ct. 948; *see also Kokinda*, 497 U.S. at 731, 110 S.Ct. 3115.

### a. Viewpoint Neutrality of the Ban

Plaintiff loosely suggests Massport prohibited it from leafletting outside the ECC because it wanted to protest against Tocci, a member of the Massport Advisory Board. In *AIDS Action Committee of Massachusetts v. Massachusetts Bay Transp. Authority*, 42 F.3d 1 (1st Cir. 1994), the First Circuit cautioned that "[r]egardless of actual motivation, grave damage is done if the government, in regulating access to public property, even appears to be discriminating in an unconstitutional fashion." 42 F.3d at 12.

The record demonstrates, however, that Massport did not apply its policy in this case on the basis of its viewpoint. To the

[4] Union members have testified that on numerous occasions they have freely come and gone on the pier without being stopped by port officers. Simply because people are able to come and go at a location without actually being stopped does not transform a non-public forum into a traditional or designated public forum. *ISKCON*, 505 U.S. at 686, 112 S.Ct. 2701 (O'Connor, J., concurring).

contrary, the record shows that Massport consistently enforces its port property policy as a flat ban on leafletting. Accordingly, I find Massport's speech policy to be viewpoint neutral.

### b. Reasonableness of the Ban

I turn then to the reasonableness of Massport's refusal to allow plaintiff to leaflet in front of the ECC. In evaluating the reasonableness of Massport's policy I am guided by the Supreme Court's analysis in *ISKCON*. In *ISKCON*, members of a non-profit religious organization wished to solicit donations and distribute written material within several airport terminals. A Port Authority regulation which forbade the repetitive solicitation of money or distribution of literature prevented them from engaging in such activities. The religious organization filed a § 1983 action against the Superintendent of the Port Authority, asserting a First Amendment facial challenge to the Port Authority's regulation. The Supreme Court held the airport was a nonpublic forum and that the Port Authority's ban on solicitation was reasonable. *ISKCON*, 505 U.S. 680–85, 112 S.Ct. 2701. The Court, however, found the ban on leafletting unreasonable given the multipurpose nature of the airport. *See id.* at 692, 112 S.Ct. 2701 (O'Connor, J., concurring). *See also Lee v. Int'l Society for Krishna Consciousness, Inc.,* 505 U.S. 830, 112 S.Ct. 2709, 120 L.Ed.2d 669 (1992) (per curiam).

In her concurring opinion, Justice O'Connor stated that "[t]he reasonableness of the Government's restriction [on speech in a nonpublic forum] must be assessed in light of the purpose of the forum and all the surrounding circumstances." *Id.* (quoting *Cornelius,* 473 U.S. at 809, 105 S.Ct. 3439). " '[C]onsideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.' " *ISKCON*, 505 U.S. at 687, 112 S.Ct. 2701 (quoting *Kokinda,* 497 U.S. at 732, 110 S.Ct. 3115). The "special

attributes" of the airport were determinative. The Port Authority had created a "huge complex open to travelers and non-travelers alike. The airport house[d] restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, post offices, banks, telegraph offices, clothing shops, drug stores, food stores, nurseries, barber shops, currency exchanges, art exhibits, commercial advertising displays, bookstores, newsstands, dental offices, and private clubs." *Id.* at 688, 112 S.Ct. 2701. Justice O'Connor concluded that unlike solicitation, which poses problems of congestion and fraud, "it is difficult to point to any problems intrinsic to the act of leafletting that would make it naturally incompatible with a large, multipurpose forum such as those at issue here." *Id.* at 690, 112 S.Ct. 2701.

The reasonableness test enunciated by Justice O'Connor is highly fact intensive and requires an individualized inquiry. *Hawkins,* 170 F.3d at 1290. The approach mandates a determination whether the right to leaflet recognized in *ISKCON* would extend to the Fish Pier. To make this determination, I follow Justice O'Connor's direction, examining the nature of the public expression in this case and the extent to which it interferes with the designated purposes of the Fish Pier and its physical attributes.

Instructive are two cases decided following *ISKCON* that apply the reasonableness standard in the context of a ban on leafletting. The Seventh Circuit in *Chicago Acorn v. Metro. Pier & Exposition Authority* addressed an issue similar to the one presented here. In that case, supporters of an ordinance to increase the minimum wage were denied permission to stage a protest during the Democratic National Convention being held on a former naval pier. The Seventh Circuit determined that the pier, which was owned by the government and had been converted into a multi-purpose recreational and commercial center—part park, part meeting and exhibition facility, part shopping em-

porium, part amusement park—was a non-public forum. Addressing the total ban on leafletting, the Seventh Circuit expressed the difficulty of determining how "broadly or narrowly the right of leafletting carved in *ISKCON* should be interpreted in the setting of the [pier]." *Chicago Acorn,* 150 F.3d at 703. The Court suggested, without making a final ruling on the issue, that the leafletting would not interfere with the commercial objectives of the pier. *Id.*

In *Hawkins v. Denver,* the Tenth Circuit upheld a total ban on leafletting in a pedestrian walkway at Denver's performing arts complex in the context of a challenge to the ban as applied to the members of a musicians union. The risk of congestion caused by the presence of twenty-five leafletters during peak traffic times in the walkway that served as the complex's emergency exit was found by the Court to present a real safety concern. 170 F.3d at 1291. The presence of the leafletters, thus, ran afoul of the city's interest in preserving the forum for its intended use.

The physical features of the Fish Pier are, of course, different from the fora at issue in *ISKCON, Chicago Acorn,* and *Hawkins.* While it is a multi-purpose enclave, the Fish Pier's size is far from being the "huge complex" in the airport in *ISKCON* or the pier in *Chicago Acorn.* Nor is it as open to the public as the performing arts complex in *Hawkins.*

With respect to the preservation of the forum for its intended use, Massport supplies particular reasons why the leafletting would interfere with the designated purpose of the Fish Pier. Specifically, Massport justifies the ban in light of the presence of heavy commercial truck traffic in the area, the risk of queuing or bottlenecking resulting from the leafletting activity, and the danger leafletting could pose in light of the truck traffic.[5] Finally, Massport defends its restriction as necessary to prevent the diminution of ECC's rental value that leafletters would cause.

I view with considerable skepticism the argument concerning purported impairment to the rental value of the ECC as a justification for the ban. I note this reason comes perilously close to suggesting opposition to the union's views because they may dampen the government's entrepreneurial initiatives. By extension of the argument, Massport presumably would not oppose the distribution of material with information solicitous to the patrons of the ECC.

Less questionable, although still arguably problematic, is the argument with respect to the congestion and bottlenecking Massport foresees resulting from the presence of leafletters. The Supreme Court has cautioned against the overstatement of such concerns: "[O]ne need not ponder the contents of a leaflet or pamphlet in order mechanically to take it out of someone's hand. The distribution of leaflets does not require the recipient stop in order to receive the message that the speaker wishes to convey; instead the recipient is free to read the message at a later time." *ISKCON,* 505 U.S. at 690, 112 S.Ct. 2701 (O'Connor, J., concurring) (internal quotations and citations omitted). In the closed setting of a commercial truck depot, such as the Fish Pier, however, this contention has considerably more force than in the relatively open context of an airport terminal. I find the bottleneck or congestion argument to be compelling with respect to the Fish Pier.

When the congestion argument is coupled with the argument that leafletting would present a threat to public safety, especially pedestrian safety at the Fish Pier, the defendants have formulated a wholly dispositive justification. The union does not contest the legitimacy of public safety as a government concern. Instead, it disputes the extent to which its activity would threaten public safety. To be sure, arguments about the potential danger pre-

---

**5.** The record shows one traffic fatality on the pier occurred in 1990 involving a truck driver

trapped between two trucks.

sented by truck traffic are rendered less compelling when it is conceded individuals attending events at the ECC may themselves be on foot traversing the same roadway that potential leafletters would use. Presumably, Massport does not view the truck traffic on the pier and around the ECC to present an overwhelming danger to pedestrian safety generally. It is conceivable that the potential for danger from truck traffic could reasonably be minimized by limiting the number and precise location of leafletters near the ECC and the time of day during which they can distribute their materials. However, I am bound by a deferential standard of review which provides that a speech restriction in a nonpublic forum "need not be the most reasonable or the only reasonable limitation," *ISKCON*, 505 U.S. at 683, 112 S.Ct. 2701 (quoting *Kokinda*, 497 U.S. at 730, 110 S.Ct. 3115), in order to pass constitutional muster. I find the concerns leading to the flat ban on leafletting to be supportable.

Any reluctance in concluding the ban is reasonable gives way, in any event, in light of the availability of an alternative channel of communication to NERCC. The pier is configured in such a way that there is only one entrance onto it. Massport permits leafletting on the sidewalks along either side of the entrance to the pier. Any attendees or visitors of the ECC must pass through this entrance. Leafletters positioned along these sidewalks are able to reach the same audience here as they would if stationed in front of the ECC.

For these reasons, I find Massport's ban on leafletting on the Fish Pier to be reasonable and that plaintiff has shown no constitutional violation of its rights as a result of this ban.

### c. Prior Authorization Requirement to Leaflet on Sidewalks

■ At the initial hearing of the motions, NERCC argued that Massport's then unwritten policy requiring permits for the distribution of leaflets on its property, including the sidewalks in front of the WTC, constituted a prior restraint on the exercise of its free speech rights. Specifically, NERCC challenged this unwritten policy as a conferral of unbridled discretion in a government official over expressive activity. Expressing my concerns about the unwritten policy, I was disinclined to find constitutional this broad grant of discretion to a government official to permit or deny expressive activity in the absence of written rules providing specific guidance for taking action on permit requests. The potential danger presented by the lack of a written policy with fixed time limits is, in fact, demonstrated here where plaintiff complains that Massport's delay in action on its permit constituted a violation of its First Amendment rights. And while I find no past violations of plaintiff's constitutional rights by actual conduct as applied to plaintiff under the prior permit regime, the lack of written regulations posed facial problems.

Following hearings in this matter, Massport submitted regulations for issuing permits on those portions of Massport property located on Northern Avenue. A copy of those regulations is attached as Appendix B. The proposed permit procedure became effective August 28, 2000. This newly adopted scheme requires a person to notify Massport twenty-four hours before engaging in expressive activity by submitting in writing a description of the activities to be conducted (leafleting, picketing, etc.); the times and locations of the proposed activities; the number of people involved; and a contact person in connection with such activity. ¶ D. Submission of an application meeting these requirements automatically qualifies as a standing permit. Massport may deny permission or propose further restrictions on the expressive activity if "the conduct of such activities as proposed at the time and place noticed presents a danger to public safety or would impede the convenient passage of pedestrian or vehicular traffic in the Affected Areas or access to buildings or facilities to and from the Affected Areas." ¶ E. But Massport must take action to notify the applicant of

its decision. Until it does so, the applicant has a valid permit.

■ The plaintiff continues to contend that Massport's permit scheme is an unconstitutional prior restraint on expression involving a standardless, subjective decision-making process. Because the plaintiff has not been denied a permit under the newly adopted permit scheme, I treat this aspect of its challenge as a facial one.[6]

■ Not all prior restraints on expression are unconstitutional. *Jews For Jesus, Inc. v. Massachusetts Bay Transp. Authority,* 984 F.2d 1319, 1327 (1st Cir.1993). A prior restraint scheme that is content neutral will be upheld if it contains certain procedural safeguards, particularly a reasonable time limit for issuing the permit and allowance for prompt judicial review. *Freedman v. State of Maryland,* 380 U.S. 51, 58–60, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *see also FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 227–31, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). It must also contain narrow, objective and definite standards to guide the licensing authority. *Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). I find Massport's permit authorization scheme adequately incorporates these procedural safeguards.

The permits here are self-executing, thus eliminating the possibility of undue delay by Massport. The written policy identifies when a permit will be denied or modified: if there is a danger to public safety or risk of impeding traffic. Further, the onus is upon Massport to notify the applicant that the permit is being denied or modified. In the event of a denial or restriction of authorization, the applicant could then seek prompt judicial review. These safeguards against prior restraint embedded in this scheme satisfy

constitutional concerns for appropriate procedures. *See Jews For Jesus,* 984 F.2d at 1327.

NERCC argues that Massport's new written policy lacks sufficiently precise standards to guide the licensing authority as required by *Forsyth County.* I disagree. Under *Forsyth County,* a prior restraint scheme can be unconstitutional if it "involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the licensing authority . . ." *Forsyth County,* 505 U.S. at 131, 112 S.Ct. 2395 (internal citations omitted). The scheme at issue in *Forsyth County* gave the administrator broad discretion to set permit fees to include any or all of the county's administrative and security expenses. *See id.* The Supreme Court found the scheme was impermissibly content-based because fees were based on the administrator's subjective prediction of listeners' "reaction to the speech." *See id.* at 134, 112 S.Ct. 2395.

In contrast, the nature of Massport's application process effectively prevents the licensing authority from exercising discretion in a content-based manner. *See id.* at 133, 112 S.Ct. 2395. Information about a particular group's affiliation or purposes is not a factor in the permit decision. *See* ¶ D. All permit decisions are guided by the same objective standards, namely, whether the proposed activities would present a danger to public safety or impede pedestrian or vehicular traffic. *See* ¶ E(1).

NERCC analogizes Massport's policy to the prior permitting scheme struck down under *Forsyth County* by Judge O'Toole. *See Nationalist Movement v. City of Boston,* 12 F.Supp.2d 182 (D.Mass.1998). In that case, the scheme authorized denial of a permit when (a) the time, route, and size of the parade would "disrupt" any street or public place ordinarily subject to traffic congestion, or (b) the parade was of a size

---

6. As recently discussed in *United States v. Frandsen,* 212 F.3d 1231, 1235–36 (11th Cir. 2000), a facial challenge to a prior restraint scheme is permitted when the claim is a lack of constitutionally required procedural safeguards. The *Frandsen* court held that an as-

sertion of absence of procedural safeguards satisfies the general rule requiring a plaintiff asserting a facial challenge to a law to establish "that no set of circumstances exists under which the [law] would be valid." *Id.*

or nature that would require so many police officers along the route as to "deny reasonable police protection to the City." *City of Boston,* 12 F.Supp.2d at 185. However, the Commissioner was free to ignore these statutory prohibitions and make exceptions "for occasions of extraordinary public interest ... for any street or public place, and for any day and hour." *Id.* at 186. Judge O'Toole rightly found that the scheme lacked sufficiently narrow standards and vested undue discretion in the licensing authority. *See id.* at 193.

The Massport policy permits the Director of Public Safety to restrict or deny permission only where the proposed activities would present a danger to public safety or impede pedestrian or vehicular traffic. *See* ¶ E(1). While "danger to public safety" may appear comparable in scope to the *City of Boston* "disruption" standard, several key distinctions exist. First, under the *City of Boston* scheme, the Commissioner had broad discretion to make exceptions to the policy. Second, the Commissioner examined the nature and content of the message in order to predict the resulting "disruption" and requisite police presence. Finally, the permit denial was inconsistent with the City's practice of granting permits for other Saturday parades to be held on normally congested streets, indicating arbitrary application of the regulation. *See id.* at 191. The Massport policy does not create the same poten-

tial for the content-based exercise of discretion by the licensing authority.

I must also examine the propriety of Massport's permit scheme as a time, place, and manner regulation. Massport concedes that the sidewalks in front of the WTC are a public forum. In public fora, the government may regulate the time, place, and manner of expression so long as the restrictions are content neutral, narrowly tailored to serve a significant government interest, and provide alternative channels for communication. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).[7]

The principal inquiry in determining content neutrality, with respect to speech cases generally, and to time, place and manner cases in particular, is whether the government has adopted a regulation of speech because of a disagreement with the message it conveys. *Ward,* 491 U.S. at 791, 109 S.Ct. 2746. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* Massport has described the information it requires from permit applicants. This description, which is not rebutted, demonstrates a content neutral regulation.

Massport has also supplied sufficient evidence that its regulation of leafletting on

---

**7.** At the last hearing in this matter, counsel for NERCC suggested that leafletting may not be subjected to time, place and manner regulation beyond generally applicable regulations of the traffic control type. Relying upon the several cases which provided the foundation for development of public forum analysis in the Supreme Court, *see, e.g., Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Cox v. New Hampshire,* 312 U.S. 569, 61 S.Ct. 762, 85 L.Ed. 1049 (1941); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), NERCC contends that the Supreme Court's initial treatment of leafletting established not only that leafletting on streets and sidewalks could not be banned or made contingent on discretionary permitting, but also settled that no specific regulation of leafletting is permissible.

This contention fails to recognize the considerable refinement in public forum law since these foundational cases were handed down in the 1930s and early 1940s. It is now well settled that even such core First Amendment activities as leafletting in a traditional public forum can be regulated by time, place and manner restrictions so long as they are narrowly tailored to serve a substantial government interest. *See generally, Jews For Jesus, Inc. v. MBTA,* 984 F.2d 1319, 1323–25 (1st Cir.1993). Indeed the existence of such narrowly tailored regulations in itself serves as a First Amendment protection. "[A]s with every exercise of a State's police power, rules that provide specific guidance to enforcement authorities serve the interest in even-handed application of the law." *Hill v. Colorado,* — U.S. —, —, 120 S.Ct. 2480, 2489, 147 L.Ed.2d 597 (2000).

sidewalks in front of the WTC is justified. The sidewalk is a narrow one, approximately ten feet wide. During the most heavily traveled times of day, sidewalk congestion creates a risk that pedestrians will be forced off the sidewalk and into Northern Avenue, itself an increasingly busy vehicular route. A regulation requiring a permit in these circumstances serves the significant government interests of ensuring public safety and controlling traffic. *Cf. Ward,* 491 U.S. at 795, 109 S.Ct. 2746. *See also Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 506–09, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (holding that traffic safety is a substantial government goal). Moreover, the permits Massport has issued to leafletters afford ample alternative channels of communication to speakers. While Massport limits the number of leafletters and the time of day they are permitted to distribute their materials—a circumstance that may reduce the potential audience leafletters reach—the

limitation does not render this avenue of communication altogether inadequate. *Ward,* 491 U.S. at 802, 109 S.Ct. 2746.

In sum, I am satisfied that Massport's time, place and manner restrictions pass constitutional muster in concept. It is possible that in the future denial or restriction of a permit by Massport under this scheme could transgress First Amendment rights, but any as-applied challenge to the execution of the Massport scheme must await the happening of that event. For present purposes, I am satisfied that Massport's current permit authorization scheme is adequate to pass factual challenge to its constitutionality.

### III. CONCLUSION

For the reasons set forth more fully above, I uphold Massport's restrictions with respect to leafletting on port property and find the plaintiff has established no past violation of its constitutional rights. Accordingly, I ALLOW Massport's motion for summary judgment.

APPENDIX A

Appendix B

## MASSACHUSETTS PORT AUTHORITY

## LOGAN OFFICE CENTER

### EAST BOSTON MASSACHUSETTS 02128

**EFFECTIVE DATE: AUGUST 28, 2000**

**SUBJECT:** Handbilling, picketing and other expressive activities on Northern Avenue sidewalks upon Port Properties.

**REFERENCE:** Massachusetts Port Authority Rules and Regulations, 740 CMR, Section 3.02(3)(e).

**PURPOSE:** To establish reasonable time, place, and manner restrictions for handbilling, picketing and other expressive activity on Massport-owned portions of Northern Avenue without reference to content, viewpoint, or message, and intended solely to ensure the safe and convenient flow of pedestrian and vehicular traffic and convenient access to port facilities and leased properties along Northern Avenue, recognizing that these areas, and especially the area directly in front of the entrance to the World Trade Center, pose particular hazards due to sidewalk dimensions, traffic patterns, and ongoing construction and redevelopment activities on and around Northern Avenue.

**SCOPE:** This Memorandum and Order shall apply to those portions of Northern Avenue in South Boston located on Massport property (roughly from B Street east past D Street) (hereafter the "Affected Areas").

## POLICIES AND PROCEDURES:

A. No person shall handbill, display picket signs, assemble or otherwise demonstrate on Northern Avenue itself, or upon crosswalks traversing Northern Avenue. Such activities shall be limited solely to sidewalks.

B. This Memorandum shall not alter the provisions of 740 CMR 3.02(3) relative to sales, solicitation, commercial activities, advertisements, or the posting of signs or written material upon structures, which are prohibited unless expressly authorized by the Authority.

C. *World Trade Center:* Due to the particular risks to public safety attending unrestricted leafleting, picketing or other expressive activities on the sidewalk abutting the façade and entranceway to the World Trade Center, including narrow sidewalks, and substantial pedestrian and vehicular traffic, no more than eight individuals, and no more than four individuals on each side of the entranceway to the World Trade Center, shall engage in such activities at the same time. Such individuals shall not block or otherwise interfere with the normal flow of pedestrian traffic and shall not stand in front of the vehicular service entrances on either side of the entranceway.

D. *Notice Requirement:* All persons wishing to leaflet, picket, or engage in other expressive activities in the Affected Areas shall notify Massport in advance of such activities. Proper notice shall include communicating to Massport, in writing, the following information:

— A description of the activities to be conducted (picketing, handbilling, etc.)

— The times and locations of the proposed activities

— The number of people who will be engaged in such activities at that time and place

— The name, address and telephone number of a person who may be contacted with respect to such activities

Such notice shall be provided at least 24 hours in advance of the proposed activities unless such advanced notice is not reasonably possible under the circumstances. Notice shall be directed to the attention of Massport's Director of Public Safety, at the

Massport Public Safety Office, One Harborside Drive, Suite 200S, East Boston. (Telephone: (617) 561–1607; Fax (617) 561–1609).

E. *Permit:* Written notification as set forth above and submitted at least 24 hours in advance of the proposed activities shall constitute permission by the Authority to engage in the activities described in the notice at the times and locations set forth in the notice for the number of people identified in the permit, subject to all of the provisions and restrictions set forth herein and in 740 CMR 3.02(4) governing the use of Port Properties, unless and/or until:

1. Massport's Director of Public Safety, or his/her designee, determines in writing, communicated to the person providing written notice and/or any person engaging in such activities, that the conduct of such activities as proposed at the time and place noticed presents a danger to public safety or would impede the convenient passage of pedestrian or vehicular traffic in the Affected Areas or access to buildings or facilities to and from the Affected Areas. If such a determination is made, the Director of Public Safety may further restrict the time, place or manner of such proposed activities as appropriate to address the safety, passage, or access issues raised, including to deny or revoke permission to engage in such activities.

or

2. In the judgment of any Police, as defined in 740 CMR 3.01, or of Massport's Director of Public Safety or its designee, such activities: (a) are being conducted in an unsafe manner, in violation of any provision of this Order or of 740 CMR 3.02, in violation of the written notice as required by paragraph D above, or in violation of any further restriction communicated pursuant to the preceding subparagraph 1,and any person persists in such conduct; or (b) the conduct of such persons, while consistent with their written notice, involves unreasonable danger under the circumstances.

or

3. Massport has by written directive closed the pertinent area for purposes of construction or to ensure safe and convenient travel to an event. Any written directive to close an area of the Port Property for an event, however, must describe the event, its time and location and set forth the reasons why such closure is appropriate.

F. Written notification as set forth above and submitted less than 24 hours in advance of the proposed activities shall constitute permission subject to the same terms and conditions as set forth in the preceding paragraph, provided further that the activities described in said notice do not conflict with previously permitted activities by others at the same time and location.

G. Nothing in this Order shall in any way restrict Massport in closing off Affected Areas on a long-term or permanent basis in connection with further development of Port Property real estate, including without limitation through ground leases to private parties.

**PENALTIES:** Violation of any of the above requirements will result in penalties as indicated in 740 CMR 3.02, and may result in removal from the Authority's Property.