# United States Court of Appeals

## For the First Circuit

Nos. 00-2398
01-1977

NEW ENGLAND REGIONAL COUNCIL OF CARPENTERS,

Plaintiff, Appellant,

v.

THOMAS J. KINTON, JR. ET AL.,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Boudin, Chief Judge,

Torruella and Selya, Circuit Judges.

Christopher N. Souris, with whom Krakow, Souris & Birmingham, LLC was on brief, for appellant.
Steven W. Kasten, with whom Cynthia L. Westervelt, McDermott, Will & Emery, David S. Mackey, Chief Legal Counsel (Massport), and Michael P. Sady, Senior Legal Counsel (Massport), were on brief, for appellees.

March 19, 2002

**SELYA**, **Circuit Judge**.  These appeals require us to decide two important First Amendment questions.  The first relates to whether a state agency constitutionally may ban all leafletting on a multi-purpose pier that it controls.  The second relates to whether such an agency may require a person seeking to distribute handbills on public sidewalks to apply in advance for a permit.

These and other questions arise out of attempts by the New England Regional Council of Carpenters (NERCC), a labor organization, to leaflet in locations owned by the Massachusetts Port Authority (Massport), an instrumentality of the Commonwealth of Massachusetts.  In one instance, NERCC applied for a permit to leaflet in front of the Exchange Conference Center (ECC), a structure located on the so-called Fish Pier.  Massport policy forbids such activity in that location, and no permit was forthcoming.  In the other instance, NERCC members tried to leaflet on the Massport-controlled public sidewalk adjacent to Northern Avenue, immediately in front of Boston's World Trade Center (WTC).  Massport prevented the leafletters from distributing handbills until they applied for, and received, a permit.

Invoking 42 U.S.C. § 1983, NERCC repaired to the federal district court and sued two Massport hierarchs — its executive director and its director of public safety — in their official

capacities.[1]  It sought injunctive relief and a declaration that Massport's practices violated its right to freedom of speech.  See U.S. Const. Amend. I.  While the suit was pending, Massport adopted new regulations applicable to the Northern Avenue sidewalks.  The district court, acting on cross-motions for summary judgment, upheld both the outright ban on leafletting at the Fish Pier and the new regulations.  New Engl. Reg'l Council of Carpenters v. Mass. Port Auth., 115 F. Supp. 2d 84 (D. Mass. 2000) (Massport I).

On the two principal issues, we affirm the district court's thoughtful decision.  We hold that the Fish Pier is a non-public forum, and that the leafletting ban — which is content-neutral and reasonable in light of the uses to which the pier is put — is a valid exercise of governmental authority.  As to the sidewalks adjacent to Northern Avenue, we hold that Massport's permit requirement is valid on its face:  the neoteric regulations sufficiently limit official discretion and the restrictions imposed are both content-neutral and narrowly tailored.

---

[1]In the proceedings below the defendants named were Virginia Buckingham (Massport's executive director) and Joseph M. Lawless (Massport's director of public safety).  By the time these appeals were argued, other individuals had succeeded to these offices.  We have substituted the incumbents as defendants and appellees pursuant to Fed. R. App. P. 43(c).  Inasmuch as they are sued only in their official capacities, we refer to them throughout as "Massport."  See Am. Policyholders Ins. Co. v. Nyacol Prods., Inc., 989 F.2d 1256, 1259 (1st Cir. 1993) (explaining that an official capacity suit is, in all respects other than in name, a suit against the government entity that the officer represents).

There are three more matters. First, we hold that NERCC's challenge to Massport's original permit policy is moot insofar as that challenge pertains to the sidewalks adjacent to Northern Avenue. Second, because the district court did not address the question of whether Massport controls other sidewalks to which the original permit policy still attaches, we remand for factfinding on that question. As a final matter, we hold that the district court did not abuse its discretion in denying NERCC's application for an award of attorneys' fees.

## I. BACKGROUND

With exceptions that we shall examine in due course, the facts of this case are largely undisputed. Our mise-en-scène begins with the Fish Pier, which was constructed by the Commonwealth almost a century ago to provide a venue for the Boston-based fishing fleet to unload, process, and auction its daily catch. Although the volume of activity has decreased markedly over time, the Fish Pier continues to serve essentially the same function today.

Geographically, the Fish Pier is located on the eastern side of Northern Avenue, directly across from Avenue D, in South Boston. It is separated from the Northern Avenue sidewalk by an iron fence that runs the full width of the pier. The fence contains passageways for pedestrian and vehicular traffic. Just inside the entrance is a security booth, staffed twenty-four hours

a day, which displays a sign that reads: "Private Property, No Trespassing." The sign also prohibits unauthorized vehicles and warns that "drivers must obtain authorization, report name, address, purpose, and allow inspection of contents" before entering the Fish Pier.

A two-lane roadway runs the length of the Fish Pier. The road is bordered on each side by long three-story buildings. The ECC is located at the very tip of the pier, and the road loops around it (allowing large trucks to turn around easily). The outermost periphery of the Fish Pier borders on Boston Harbor. It is used for the docking, unloading, fueling, and repair of fishing boats.

There are small parking lots and sidewalks on either side of the interior road near the entrance to the Fish Pier, but there are no sidewalks along the length of the three-story buildings. These buildings do sport raised loading dock platforms. While NERCC calls these platforms "elevated sidewalks," that nomenclature is misleading: the photographic evidence shows that each of these platforms is appurtenant to, and part of, the adjacent building.

Massport became the proprietor of the Fish Pier during the 1970s and has continued to operate it as a commercial fishing depot. During this interval, Massport has made room for several other commercial uses. For example, the long buildings on either side of the interior road house a number of offices, including

those of Massport itself, two law firms concentrating in admiralty practice, a business that compiles sports statistics, and the Israeli Chamber of Commerce.  There are also two restaurants on the premises.  The ECC is a recently-renovated facility — it was formerly the New England Fish Exchange — that is available to the general public by reservation.  The ECC contains conference and meeting rooms, and can handle events for as many as 175 people.

Massport's regulations make it unlawful to "[p]ost, distribute, or display signs, advertisements, circulars, printed or written matter" in "any area . . . of the Port Properties" without written permission. Mass. Regs. Code, tit. 740, § 3.02(3)(e).  The same regulation prohibits unauthorized entry into restricted areas under Massport's control.  See id. § 3.02(2).  Areas posted as being closed to the public are deemed "restricted," id., and NERCC does not dispute that the Fish Pier is so demarcated.[2]  On that basis, Massport refuses to permit leafletting on the Fish Pier.

On December 10, 1998, NERCC applied for permission to distribute handbills in front of the ECC.  It believed that the ECC was to be used six days later for a holiday party sponsored by the Tocci Building Corporation and desired to leaflet on that date to call attention to certain employment practices engaged in by the

---

[2]NERCC does question whether the restrictions on entry to the Fish Pier are enforced, but its counsel made clear at oral argument that this factual dispute is only relevant to whether the Fish Pier is a public forum  We shall return to that question shortly. See infra Part V(A).

company (whose chief executive officer, John Tocci, also serves on a Massport advisory board). After NERCC's counsel learned informally that Massport intended to deny the request and to restrict leafletting to the Fish Pier entrance on Northern Avenue, NERCC filed suit seeking injunctive relief and a declaration that Massport's "no leafletting" policy violated the First Amendment. When NERCC thereafter learned that it was mistaken as to the date of the Tocci event, it withdrew the request for a preliminary injunction but chose to proceed with the constitutional challenge.

NERCC included in its complaint a prior permit dispute concerning a neighboring location: the sidewalk in front of the WTC. The WTC is located on Northern Avenue, proximate to the Fish Pier and to Avenues B and D. Due to massive construction efforts in that part of South Boston, some sidewalks near the WTC are isthmian corridors bounded by walls of plywood and concrete. Even where no construction is presently ongoing and makeshift arrangements do not predominate, the sidewalks are narrow. Northern Avenue is a major transportation artery, and at peak hours the entire area is congested. Constant vehicular traffic is compounded by high pedestrian traffic.

Massport owns the section of Northern Avenue that runs in front of the WTC, subject to an agreement with the City of Boston to preserve it as a public right-of-way. On November 17, 1998 — a date when John Tocci was scheduled to speak at the WTC — thirteen

NERCC members attempted to leaflet at various locations in the vicinity of the building. They were threatened with arrest and told that they could not distribute handbills until they received permission from Massport. NERCC's counsel immediately transmitted a permit application by facsimile to Massport's director of public safety (DPS) while the union members and the police officers waited. The permit issued around four hours later. In its complaint, NERCC attacked the process on two grounds: that the issuance of the permit had been unduly delayed, and that Massport's requirement for a permit, based on an essentially standardless policy, was in any event unconstitutional.

In the early stages of the litigation, the district court expressed concern that Massport's original policy requiring a permit to distribute leaflets on a public sidewalk lacked adequate safeguards. The court wisely offered Massport time to consider its position. Massport proceeded to crystallize its policy by promulgating a directive amending Mass. Regs. Code, tit. 740, § 3.02(3)(e) with respect to the portions of Northern Avenue under its control. These amended regulations are reproduced in an appendix to the lower court's opinion, see Massport I, 115 F. Supp. 2d at 99-100, and we assume the reader's general familiarity with the text.

Under the new regime, all persons desiring to distribute leaflets, picket, demonstrate, or conduct similar expressive

activity on those portions of Northern Avenue under Massport's control must furnish the agency with advance notice describing the activity, its time and location, and the number of people who will engage in it. The notice also must contain the name, address, and telephone number of a contact person. The filing of this information allows the applicant to engage in the described activity, but Massport may modify, revoke, or deny the permit on a number of grounds either prior to or during the course of the activity. Pertinently, Massport may take such a step if the DPS determines that the activity "presents a danger to public safety or would impede the convenient passage of pedestrian or vehicular traffic" (subparagraph E.1); or if either the DPS or a police officer determines that the activity is being conducted in an unsafe or unreasonably dangerous manner, exceeds the scope of the notice, or violates time, place, and manner restrictions delineated elsewhere in the regulation (subparagraph E.2); or if Massport has taken appropriate measures to "close the pertinent area for purposes of construction or to ensure safe and convenient travel to an event" (subparagraph E.3).

Focusing on Northern Avenue, the district court rejected NERCC's facial challenge to these regulations and entered summary judgment for the defendants. The court found, inter alia, that the permit provisions were not an unconstitutional prior restraint because they sufficiently limited official discretion. Massport I,

115 F. Supp. 2d at 96. The court also found that the regulations comprised valid time, place, and manner restrictions. Id. at 97. The court did not rule on the original permit policy, commenting only that NERCC "has established no past violation of its constitutional rights." Id.

The district court also ruled in Massport's favor on the Fish Pier claim. The court held that the Fish Pier is a non-public forum, id. at 91, and that the ban on leafletting is reasonable in light of the nature of the premises, id. at 94. In a subsequent rescript, the court noted that Massport's promulgation of the revised regulations had not been judicially decreed and, therefore, concluded that NERCC could not collect attorneys' fees as a prevailing party under 42 U.S.C. § 1988. NERCC v. Buckingham, No. 98-12538 (D. Mass. June 4, 2001) (unpublished order). These appeals followed.

## II. JUSTICIABILITY

We pause at the outset to determine whether the issues that NERCC raises are properly before us.

Section 1983 guards against violations of federal rights by state actors, and there is no dispute that Massport, for our purposes, qualifies as such. See generally Mass. Gen. Laws ch. 91, §§ 1-2; Opinion of the Justices, 136 N.E.2d 223, 226 (Mass. 1956). The law is settled that federal subject matter jurisdiction exists for colorable claims brought under 42 U.S.C. § 1983. See Bonas v.

-10-

<u>Town of N. Smithfield</u>, 265 F.3d 69, 73-74 (1st Cir. 2001); <u>see</u> <u>also</u> 28 U.S.C. § 1331.  NERCC's claims qualify under this rubric.

The question of standing is somewhat less pellucid.  It is black-letter law that:

> The basic requirements for Article III standing are that the petitioner is someone who has suffered or is threatened by injury in fact to a cognizable interest, that the injury is causally connected to the defendant's action, and that it can be abated by a remedy the court is competent to give.

<u>Save Our Heritage, Inc.</u> v. <u>FAA</u>, 269 F.3d 49, 55 (1st Cir. 2001). NERCC easily meets the injury requirement with respect to the Fish Pier claim and the as-applied portion of its Northern Avenue claim: in both instances, it alleges injury from the way Massport handled its permit requests.  But whereas the former injury is fully redressable by judicial decree, the latter no longer can be remedied by a court.

To be sure, that injury was redressable when NERCC commenced this litigation.  But time did not stand still, and Massport subsequently revised the policy applicable to Northern Avenue.  This revision rendered the as-applied portion of the Northern Avenue claim moot.  <u>See</u> <u>Becker</u> v. <u>FEC</u>, 230 F.3d 381, 386 n.3 (1st Cir. 2000) (distinguishing mootness from redressability). NERCC seeks only injunctive and declaratory relief, not damages — and it would be pointless either to enjoin the enforcement of a regulation that is no longer in effect or to declare its

-11-

constitutional status.  See D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 54-55 (1st Cir. 1999).

NERCC concedes that the original permit policy no longer applies to Northern Avenue, but asserts that it continues to apply to other public streets under Massport's control.  This allegation falls short of salvaging the as-applied challenge:  the bare possibility that Massport may attempt to enforce its original policy in other locations is insufficient to invoke the narrow exception for cases capable of repetition yet evading review.  See Cruz v. Farquharson, 252 F.3d 530, 534 (1st Cir. 2001).  The record does not show that Massport controls any other location that is either similar to Northern Avenue or likely to be the site of leafletting activity.  Thus, NERCC has not "demonstrated [a] probability" that the objectionable conduct will recur.  Id.  On this basis, we find the Northern Avenue as-applied challenge moot.

This case does not fall into the exception to mootness articulated in City of Mesquite v. Alladin's Castle, Inc., 455 U.S. 283 (1982).  There, the Court held that "a voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  Id. at 289.  Under circuit precedent, however, the City of Mesquite exception applies "only when there is a reasonable expectation that the challenged conduct will be repeated following dismissal of the case."  D.H.L. Assocs., 199 F.3d at 55.  Here, there is simply no basis for

-12-

suggesting that the original permit policy will be reinstated following the conclusion of the litigation.[3]

This does not mean, of course, that NERCC's claim regarding other Massport-owned streets is completely eclipsed. NERCC has alleged that the original policy still applies in those venues, and it has challenged that policy on its face. "It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review . . . ." Forsyth County v. Nationalist Movement, 505 U.S. 123, 129 (1992). Under that rule, leafletters may facially challenge permit schemes despite the fact that they have neither applied for a permit to distribute handbills on a particular street nor made definitive plans to do so. City of Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 755-56, 761 (1988).

We thus conclude that four issues are properly before us: (1) the constitutionality of Massport's ban on leafletting at the Fish Pier; (2) the facial validity of Massport's newly-promulgated

---

[3]Even if City of Mesquite applied, the Court has made clear that, under these circumstances, the granting of equitable relief is discretionary. See City of Mesquite, 455 U.S. at 288 (noting that the court of appeals could have dismissed the issue as moot, but that it was under no duty to do so); accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189 (2000). Given the circumstances of this case, we think it wise to avoid an adjudication addressed to a policy that no longer applies at the site in question. Cf. El Dia, Inc. v. Hernandez-Colon, 963 F.2d 488, 496 (1st Cir. 1992) (eschewing discretionary review where the challenged order was "merely a precursor to the later formulation of actual regulations").

-13-

leafletting regulations vis-à-vis Northern Avenue; (3) the facial validity of Massport's original leafletting policy vis-à-vis streets and sidewalks apart from Northern Avenue; and (4) the correctness of the district court's denial of attorneys' fees.

We quickly dispense with the third issue. The district court never focused on this claim — although preserved, it was not emphasized below — and the record is simply too sketchy to tell whether Massport controls any other public streets or sidewalks. Massport denies such ownership, but a map of its South Boston properties appears to indicate that other streets, including Avenue D, traverse them. Whether Massport controls those streets, and whether sidewalks run alongside, are even more enigmatic questions on this record. Due to this pervasive uncertainty, we think that the course of prudence is to remand this issue to the district court for factfinding. Accordingly, we do not address it further.

## III. STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the trial court must resolve all disputed facts in favor of the non-moving party and draw all reasonable inferences to that party's benefit. See, e.g., Dynamic Image Techs., Inc. v. United States,

221 F.3d 34, 39 (1st Cir. 2000). These principles apply equally when all parties cross-move for summary judgment. See EEOC v. Steamship Clerks Union, 48 F.3d 594, 603 (1st Cir. 1995) ("Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn . . . .").

On appeal, we utilize the same framework. In that process, we afford de novo review to orders granting or denying summary judgment. E.g., Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000). This case (apart from the remanded issue, see supra Part II) seems a suitable candidate for summary judgment. At oral argument in this court, counsel for all parties explicitly denied the existence of any material factual disputes with respect to the Fish Pier claim, and the Northern Avenue claim reduces to a facial challenge to Massport's new regulations (and, thus, presents a pure question of law).

## IV. THE CONSTITUTIONAL STANDARDS

Leafletting is a respected tradition in our democratic society, and it ranks as one of the core free speech activities shielded by the First Amendment. United States v. Grace, 461 U.S. 171, 176-77 (1983). Though solicitously protected, however, the right to leaflet is not absolute. E.g., Hill v. Colorado, 530 U.S. 703, 730 (2000). The constitutional standard by which the validity of a restriction on leafletting will be tested depends on two

-15-

variables: the nature of the forum in which a restriction applies and the type of restriction. See Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 44-46 (1983). We discuss these sequentially.[4]

A forum can be a traditional public forum, a designated public forum (sometimes called a limited public forum), or a non-public forum. In a traditional or designated public forum, content-neutral restrictions on the time, place, and manner of expression must be narrowly tailored to serve some substantial governmental interest, and must leave open adequate alternative channels of communication. Id. at 45-46. In a non-public forum, the constitutional hurdle is considerably lower: to clear it, a viewpoint-neutral restriction need only be reasonable. Id. at 46. In such a setting, the reasonableness of a particular regulation is determined by a fact-intensive balancing test that takes into account such factors as the uses to which the forum typically is put, the particular risks associated with the speech activity at

_____

[4]In Jews for Jesus, Inc. v. Mass. Bay Transp. Auth., 984 F.2d 1319 (1st Cir. 1993), a panel of this court chose to analyze a leafletting ban without first determining the nature of the forum, maintaining that both the public and non-public forum inquiries converge when there is no "credible reason why the regulations further the forum's purpose." Id. at 1324. This analytic approach is awkward, however, because it requires a reviewing tribunal to know the results of a test before knowing which test applies. Comparable cases, of more recent vintage, have indicated a preference for a more deliberate analysis, e.g., Chicago Acorn v. Metro. Pier & Expo. Auth., 150 F.3d 695, 702 (7th Cir. 1998) (determining the nature of the forum first), and we follow that path.

issue, and the proffered rationale for the restriction.  See Int'l

Soc'y for Krishna Consciousness, Inc. v. Lee (ISKCON), 505 U.S.

672, 687-93 (1992) (O'Connor, J., concurring); see also id. at 683-

85 (plurality op.).[5]

Some spaces — such as public streets, sidewalks, and

parks — are presumptively public fora, and in most cases no

particularized inquiry into their precise nature is necessary.

See, e.g., Frisby v. Schultz, 487 U.S. 474, 481 (1988).  We say

"most" rather than "all" because this presumption can be rebutted

in specific instances.  See United States v. Kokinda, 497 U.S. 720,

728-29 (1990) (plurality op.) (rejecting the suggestion that all

sidewalks are public fora).  The problem of classification grows

increasingly difficult in instances in which no presumption is

available, and categorical distinctions are of little help in

borderline cases.  See, e.g., ISKCON, 505 U.S. at 681-82 (plurality

op.) (rejecting the suggestion that all transportation terminals

---

[5]The ISKCON Court upheld  a ban on solicitation within an airport terminal.  In a companion case, the Court struck down a concomitant ban on leafletting, basing that decision on the reasons stated in the concurrences and dissent in ISKCON.  Lee v. Int'l Soc'y for Krishna Consciousness, Inc., 505 U.S. 830, 831 (1992) (per curiam).  Because Justice O'Connor's ISKCON concurrence constitutes the narrowest ground for the decision, it is the most authoritative pronouncement on the standards applicable to leafletting in a non-public forum.  See City of Lakewood, 486 U.S. at 764 n.9 (explaining that "when no single rationale commands a majority, the holding of the Court may be viewed as the position taken by those Members who concurred in the judgmen[t] on the narrowest of grounds") (citations and internal quotation marks omitted).

should be analyzed in the same manner).  In the end, an inquiring court must examine the nature of the locus, as well as its history, to determine whether it qualifies as a traditional public forum. See id. at 680-82.  The situation is somewhat different in respect to designated public fora; for purposes of that classification, the Supreme Court has required evidence that the State intentionally has opened the area for expressive purposes.  See id. at 680.

In addition to this taxonomy, the case at hand also requires an understanding of the doctrine of prior restraints. This venerable doctrine guards against the threat of government censorship by requiring that public licensing and permit schemes contain adequate substantive and procedural safeguards against arbitrary (or content-based) State action.  See, e.g., FW/PBS, Inc. v. Dallas, 493 U.S. 215, 225-26 (1990).  Two lines of cases have sprouted in this soil:  one focused on the substantive criteria that restrain official discretion and the other on procedural safeguards.  See id.  The substantive strand reflects the hoary principle that the First Amendment demands that such regulations contain "narrow, objective, and definite standards to guide the licensing authority."  Forsyth County, 505 U.S. at 131 (quoting Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969)). The procedural strand is elaborated in Freedman v. Maryland, 380 U.S. 51 (1965), in which the Court ruled, in the motion picture licensing context, that prior restraints may be imposed only

temporarily; that they must allow for prompt judicial review; and that the licensor must bear the burden of asking a court to suppress the speech. Id. at 58-60.

Until very recently, it was unclear whether the Freedman formulation applied to content-neutral permit schemes designed to ensure public safety in a traditional public forum. Compare, e.g., Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 560 (1975) (stating that Freedman applies in a public forum), with Poulos v. New Hampshire, 345 U.S. 395, 403 (1953) (suggesting that a different standard applies if the license requirement reflects "a ministerial police routine"). The Supreme Court erased this uncertainty within the past few months. In Thomas v. Chicago Park Dist., 122 S. Ct. 775 (2002), the Court clarified that Freedman's procedural requirements do not apply to permit schemes that eschew any consideration of the content of speech, but, rather, limit themselves to addressing public safety concerns. Id. at 780. At the same time, the Court reaffirmed the pertinence of the Forsyth County line of cases to such permit schemes, holding that even content-neutral time, place, and manner regulations must "contain adequate standards to guide the official's decision." Id. The framework erected by the Thomas Court governs this case.[6]

_____

[6]It does not require citation of authority to acknowledge that Thomas, which comes to us with the imprimatur of the Supreme Court, supersedes any contrary intimation contained in our earlier precedent, namely, Jews for Jesus, Inc. v. Mass. Bay Transp. Auth., 984 F.2d 1319, 1327 (1st Cir. 1993).

## V.  THE FISH PIER BAN

We divide our discussion of the outright ban on leafletting imposed in respect to the Fish Pier proper into two segments.  See supra note 4.  We grapple first with the status of the Fish Pier and then ponder the validity of the ban.

### A.  Status of the Fish Pier.

We consider the Fish Pier to be a property separate and apart from the abutting section of Northern Avenue.  See ISKCON, 505 U.S. at 676-79 (proceeding similarly in the case of an airport terminal), Hawkins v. City of Denver, 170 F.3d 1281, 1287 (10th Cir. 1999) (doing the same in the context of a government-owned performing arts center); see also Chicago Acorn v. Metro. Pier & Expo. Auth., 150 F.3d 695, 698 (7th Cir. 1998) (treating separately each distinct area of Chicago's Navy Pier).  Since the Fish Pier is autonomous for First Amendment purposes, we treat Massport's policy as a total ban, rather than as a time, place, and manner regulation that restricts leafletting to the Northern Avenue sidewalk (which lies outside the gates).

NERCC contends that the Fish Pier is a traditional public forum, or, alternatively, a designated public forum.  In determining whether either of those labels applies, we must consider both the nature of the property and its past uses.  See ISKCON, 505 U.S. at 680-82.  Historically, the Fish Pier was used only for purposes related to the commercial fishing industry.

While the permitted uses have changed over time, the pier remains quite different from the types of property that are most often deemed to be public fora.  It is not a public thoroughfare like a street or sidewalk, e.g., Frisby, 487 U.S. at 481, or a gathering place like a park or town green, e.g., Knights of Columbus v. Town of Lexington, 272 F.3d 25, 31 (1st Cir. 2001).

Although space on the pier is no longer limited to activities directly related to receiving, storing, and shipping fish — the Fish Pier is now home to a conference center, two eateries, and several offices — the dominant character of the property is still that of a commercial fishery.  Space on the seaward side is used for unloading fish; the two long buildings are used to store the catch; and the central area is used for loading fish onto trucks, which circle around the ECC (formerly known as the Fish Exchange) and exit through the gate onto Northern Avenue. The site is notable for the absence of either sidewalks or other design characteristics that might be viewed as welcoming the general public.

NERCC points out, correctly, that there is an interior roadway on the Fish Pier, and that members of the public enter the premises for a variety of purposes.  Furthermore, NERCC has sought to cast doubt upon Massport's contention that the Fish Pier is a closed facility limited to authorized persons by proffering affidavits of NERCC members who assert that they entered the Fish

Pier without being stopped or questioned. But Massport has taken appropriate steps to restrict access to the site; and even if Massport's policy of restricted access is erratically enforced, the fence, gate, security booth, and signage hardly add up to an open invitation for the public to enter.

We do not believe that these attributes are enough to convert the Fish Pier into a traditional public forum. See ISKCON, 505 U.S. at 680 (expressly stating that comparable evidence, without more, is insufficient to justify a finding that a location is a public forum); Greer v. Spock, 424 U.S. 828, 836 (1976) (similar). While the level of public access is a salient consideration, it cannot be accorded decretory significance — especially since the Fish Pier's primary use does not depend at all on public access.

Nor is the Fish Pier a designated public forum. At most, the circumstances suggest that Massport tolerates the presence of some members of the public on the Fish Pier, including persons attending ECC events, restaurant patrons, and an occasional passerby bent on contemplating the harbor's scenic beauty. Such tolerance is not tantamount to an affirmative act — and an affirmative act of a governmental body is required to support a finding that the authorities have designated a forum as a place for public expression. ISKCON, 505 U.S. at 680 (plurality op.).

The proof of the pudding is in the case law. On balance, the Fish Pier is far less of a public space than, say, the airport terminal at issue in ISKCON or the post office sidewalk at issue in Kokinda, neither of which was found to be a public forum. See id. at 683; Kokinda, 497 U.S. at 730. This conclusion flows principally from the fact that the Fish Pier's primary uses are not dependent upon public access. We hold, therefore, that the Fish Pier is a non-public forum.

## B. **The Validity of the Ban**.

Because the ban on leafletting, as written, is clearly content-neutral, and there is absolutely no record evidence to support an inference that Massport has applied it unevenly, we turn next to the reasonableness of the ban.

At the expense of belaboring the obvious, we reiterate that leafletting is one of the most highly respected (and, therefore, highly protected) ways in which citizens may exercise First Amendment rights. See Grace, 461 U.S. at 176-77. Building on this sturdy foundation and highlighting the unobtrusive nature of the activity, NERCC suggests that an outright ban on leafletting never can be reasonable. We do not agree.

NERCC bases much of its argument on the fact that the ISKCON Court invalidated a ban on leafletting in an airport. However, NERCC's attempts to reason from that analogy are unpersuasive. ISKCON did not go so far as to suggest that a ban on

leafletting is always unconstitutional. To the contrary, the case suggests that we should refrain from basing a reasonableness determination on any single factor (such as whether a ban involves leafletting or whether a non-public forum is a multi-purpose facility), encouraging us instead to weigh all the factors that point in favor of allowing speech against those that support the need for restrictions. See ISKCON, 505 U.S. at 690 (O'Connor, J., concurring). In this process, we bear in mind that while the regulation adopted by the State need not be the most reasonable of all available options, id. at 683 (plurality op.), the State's justifications must be solidly grounded. We hold, therefore, that a ban on leafletting in a non-public forum is not impermissible per se. See Hawkins, 170 F.3d at 1289-90, 1292 (sustaining a total ban on leafletting).

We proceed from the general to the particular. As said, the Fish Pier accommodates multiple uses, and thus is distinguishable from the sidewalk in Kokinda and from other single-purpose fora. See ISKCON, 505 U.S. at 688 (O'Connor, J., concurring) (making this distinction). But context in this type of case often involves matters of degree, and there is much less diversity of use on the Fish Pier than at a large international airport, see id. at 689 (noting that the airport terminal at issue doubled in brass as a shopping mall), in Boston's subway stations, see Jews for Jesus, Inc. v. Mass. Bay Transp. Auth., 984 F.2d 1319,

-24-

1325 (1st Cir. 1993) (noting the presence of "a myriad of . . . nontransit activity"), or even at the Chicago Navy Pier, see Chicago Acorn, 150 F.3d at 702 (noting the existence of a shopping mall, an entertainment center, and an amusement park on the pier). The closest parallel is Hawkins, in which there were a comparable number of secondary uses:  three commercial establishments incidental to the venue's primary purpose (a performing arts center).  170 F.3d at 1290.  There, however, unlike in this case, the forum's primary use depended upon access by members of the public — yet the Tenth Circuit nonetheless found an outright ban on leafletting reasonable.  Id. at 1289-90.  All in all, the nature of the Fish Pier weighs quite heavily against NERCC's position.

This brings us to Massport's rationale for barring the distribution of handbills on the Fish Pier.[7]  Massport has offered several reasons supporting the ban.  Some of these reasons are of uncertain force in the First Amendment calculus (e.g., Massport's insistence that it may legitimately exclude leafletters from the Fish Pier because they are undesirable to tenants or because the Fish Pier is classified as a restricted area), and we do not dwell on them.  Rather, we go directly to Massport's principal rationale:

_____

[7]Although the regulations cover the Fish Pier as a whole and apply not only to leafletting but also to other First Amendment activities, the parties focus on leafletting in the vicinity of the ECC.  Accordingly, we limit our holding to that activity and place.

-25-

that public safety would be endangered if leafletting were allowed at the entrance to the ECC.

As an abstract matter, this rationale stands on solid legal footing. See Hill, 530 U.S. at 715 (stating that protection of citizens' health and safety is within the government's traditional police power). In the particular setting, the rationale also withstands scrutiny: the fishing fleet generates a great deal of activity; there is a high volume of truck traffic; and there appears to be precious little room in front of the ECC. What space is available serves primarily as a roadway and truck turnaround. In these cramped confines, pedestrian safety and traffic flow are vital concerns. The validity of these concerns is underscored by the fact that, when Massport erected concrete bollards to protect the entrance to the ECC several years ago, the bollards were so severely damaged by trucks executing turnarounds that Massport had to remove them. Thus, although there are few, if any, problems intrinsic to the act of leafletting, safety is a plausible concern here.

In an effort to parry this thrust, NERCC argues that Massport has exhibited a general disregard for pedestrian safety by allowing pedestrians to walk the length of the pier to attend events at the ECC (or, sometimes, merely to gaze at the harbor). NERCC's factual premise is sound: a pedestrian must traverse the interior roadway to reach and enter the ECC. But NERCC's suggested

conclusion — that Massport cares not a fig for pedestrian safety — does not follow.

At most, NERCC's allegations suggest that a leafletting ban would not solve every safety problem on the Fish Pier. But even in a public forum, "partial solutions" may be acceptable. Globe Newspaper Co. v. Beacon Hill Arch'l Comm'n, 100 F.3d 175, 191 (1st Cir. 1991). In a non-public forum, the reasonableness standard is satisfied as long as there is a plausible basis for distinguishing between restricted activities and allowed activities.

Here, there is such a basis for differentiating between leafletters and ordinary pedestrians. Given the peculiar setting of the ECC entrance, leafletters run a serious risk of obstructing vehicular traffic and distracting pedestrians as they traverse the roadway.

We have said enough on this score. Massport's public safety concerns pass the reasonableness screen. Accordingly, we hold that Massport's interest in public safety in the context of a commercial fishery and truck depot justifies the outright ban on leafletting activity that it has imposed (at least in front of the ECC, see supra note 7).

## VI. THE NORTHERN AVENUE PERMIT

We next address NERCC's challenge to Massport's newly-adopted regulations (which pertain to leafletting on Northern

Avenue, in the vicinity of the WTC). Two things are clear: the sidewalks along Northern Avenue constitute a traditional public forum, see Frisby, 487 U.S. at 481, and the challenged regulations, on their face, are content-neutral. Thus, the lens of our inquiry narrows to whether the regulations (1) possess adequate standards to guide the exercise of official discretion, and (2) are narrowly tailored to a significant state interest while leaving open satisfactory alternative means of communication. See Thomas, 122 S. Ct. at 780 & n.3. We address these questions separately.

## A.  **The Adequacy of the Standards**.

NERCC charges that the regulations afford Massport unbridled discretion to deny leafletting requests. It seems obvious, however, that certain provisions contained in the regulations, specifically, the notice and "automatic permit" provisions, are purely ministerial. Those provisions involve no affirmative action on Massport's part.

The fact that permits issue automatically does not end our inquiry. The regulations do identify several instances in which either Massport officials or police officers may deny or revoke permits by acting affirmatively. We look closely at those provisions.

Subparagraph E.2 allows Massport to revoke a permit based on particular conduct by leafletters. Because this proviso grants discretion to limit activity at the time when it occurs, it is not

a prior restraint on speech, but, rather, a means through which public safety personnel may terminate an activity that becomes dangerous or comes to violate the time, place, and manner restrictions contained in the regulations. As such, the proviso constitutes an unremarkable and ubiquitous safeguard, constitutional on its face. Whether the power that it vests in public officials may, at some future date, be applied in an unconstitutional manner is not now before us.

Subparagraphs E.1 and E.3 are a different breed. Those provisions are prior restraints on speech because each of them envisions revocation of a permit <u>before</u> the leafletting event begins.[8] Consequently, these rules may be sustained only if they contain "narrow, objective, and definite" criteria. <u>Shuttlesworth</u>, 394 U.S. at 151. We undertake that inquiry.

Subparagraph E.1 gives the DPS power to deny or revoke a permit if the proposed activity would present "a danger to public safety or would impede the convenient passage of pedestrian or vehicular traffic." Subparagraph E.3 authorizes Massport to bar access to an area "for purposes of construction or to ensure safe and convenient travel to an event" by issuing a specific written

_____

[8]To be sure, the automatic issuance of permits negates one potential concern about the regulations, namely, that officials could effectively deny permits by dragging their feet. <u>See</u> <u>FW/PBS</u>, 493 U.S. at 223-24. In all other respects, however, the power to revoke a permit prior to the event presents the same <u>Shuttlesworth</u> concerns as the power to deny it in the first place.

directive explaining the extent of, and justification for, the closure. Public safety and convenience are paradigmatically permissible considerations in the issuance of permits. See, e.g., Cox v. New Hampshire, 312 U.S. 569, 575-76 (1941). Nonetheless, a regulation adopted to serve these salutary ends may fail to pass constitutional muster if it also authorizes officials to make judgments on matters beyond their competence. See, e.g., Shuttlesworth, 394 U.S. at 149-50, 159 (striking down a permit ordinance that involved consideration of public morals and decency); DeBoer v. Village of Oak Park, 267 F.3d 558, 572-73 (7th Cir. 2001) (invalidating a regulation that empowered a local official to decide what "benefits the public as a whole"). That criticism has no application here, as the challenged regulations focus on judgments about public safety — the sort of judgments that are inherently within the competence of the DPS and the constabulary.

A more difficult question is whether these regulations are sufficiently definite to limit official discretion. See Thomas, 122 S. Ct. at 780; see also City of Lakewood, 486 U.S. at 769-70 (holding that unfettered — and, therefore, impermissible — discretion may exist when a regulation is silent as to the criteria to be used by the official administering it). Once again, however, we must give weight to the agency's narrowing interpretation of its own regulations — especially since the record contains no evidence

that the regulations have been administered in an unfair or discriminatory fashion.  See Cox, 312 U.S. at 577.  In this instance, it is possible, as Massport argues, to construe the regulations to limit Massport's discretion to revoke permits to cases of substantial safety and access concerns.  We honor that plausible interpretation.  See City of Lakewood, 486 U.S. at 770 n.11 (directing courts to "presume any narrowing construction or practice to which [a state] law is fairly susceptible") (citations and internal quotation marks omitted).  So interpreted, the regulations survive a facial challenge.  See Thomas, 122 S. Ct. at 781 (warning against "insisting upon a degree of rigidity that is found in few legal arrangements").  If and when a pattern of abuse emerges, that will be the time to deal with infelicitous applications of the regulations.  See id.

### B.  **Narrow Tailoring**.

This leaves the status of the notice and permit revocation provisions as time, place, and manner restrictions. Massport contends that the information supplied in the notice allows it to allocate security resources appropriately and to accommodate competing requests for the use of limited space. Relatedly, it points to the narrow, thronged sidewalks of Northern Avenue and insists that the ability to modify, coordinate, and sometimes revoke permits is necessary to protect public safety and convenience there.

NERCC does not challenge Massport's version of the underlying facts: the area is congested; the sidewalks are crowded; and there is not much space for movement. NERCC also concedes that requirements such as those contained in the regulations may very well address substantial governmental interests in the case of disruptive uses of the space (e.g., parades or rallies). It persists, however, in claiming that the regulations are not narrowly tailored because they encompass even solitary leafletting.

NERCC's argument on this point hinges primarily on its reading of the Supreme Court's decision in Lovell v. City of Griffin, 303 U.S. 444 (1938). In NERCC's view, Lovell stands for the proposition that any permit restriction on leafletting on public sidewalks is unconstitutional. We do not agree.

In Lovell, the Court struck down a permit requirement that applied to the distribution of handbills on municipal sidewalks. Id. at 451. Notwithstanding this outcome, Lovell cannot be read as authority for a broad rule that permit requirements are unconstitutional per se insofar as they apply to leafletting on public sidewalks. The vice that troubled the Lovell Court was not that the permit scheme affected leafletting, but, rather, that it amounted to a citywide censorship scheme. See Cox, 312 U.S. at 577 (distinguishing Lovell on this basis). The right to leaflet on public sidewalks, like any core speech activity, "may

-32-

be regulated in the interest of all; it is not absolute, but relative, and must be exercised in subordination to the general comfort and convenience." Greer, 424 U.S. at 836 (citation and internal quotation marks omitted).[9]

To reconcile these competing interests, our constitutional jurisprudence applies different tests depending on whether a particular location — whatever its use — is deemed to be a traditional public forum, a designated public forum, or a non-public forum. Compare id. at 838 (upholding a restriction on leafletting on portions of a military base that did not comprise a public forum), with Flower v. United States, 407 U.S. 197, 199 (1972) (per curiam) (overturning a conviction for leafletting on portions of a military base as to which the military had abandoned any claim of non-public forum status). Even in a public forum, a permit requirement that is narrowly tailored to a significant governmental interest and affords adequate alternative means of communication is allowable. See Thomas, 122 S. Ct. at 780 & n.3. Such a regulation need not be the least restrictive alternative to be considered narrowly tailored. Knights of Columbus, 272 F.3d at 33.

---

[9]To be sure, the Court has, in certain contexts, rejected particular justifications for a leafletting ban, e.g., Schneider v. State (Town of Irvington), 308 U.S. 147, 162 (1939) (rejecting litter prevention as a justification), but cases such as these do not come close to suggesting that leafletting restrictions must be analyzed under a different test than restrictions on other core speech activities.

What we have said does not mean that the particular type of speech activity is immaterial in evaluating the legitimacy of restrictions. It is the function of the narrow tailoring inquiry to determine whether the State's articulated rationale actually supports restrictions placed on particular conduct. See McGuire v. Reilly, 260 F.3d 36, 48 (1st Cir. 2001) ("A law is narrowly tailored if it promotes a substantial governmental interest that would be less effectively achieved without the law and does so without burdening substantially more speech than is necessary to further this goal."). We turn to that task.

Relying principally on Community for Creative Non-Violence v. Turner, 893 F.2d 1387 (D.C. Cir. 1990) (CCNV), NERCC hypothesizes that the permit requirement is invalid because it burdens substantially more speech than necessary. The permit revocation provision is not narrowly tailored, this thesis runs, because it applies to small-scale leafletting that is not inimical to public safety and convenience.

In CCNV, the D.C. Circuit held that a similar regulation failed the narrow tailoring test because it affected many incidents of free expression that posed little or no threat to the safety and convenience of persons in a public forum. Id. at 1392. Other courts reached similar conclusions on particular facts. See, e.g., Douglas v. Brownell, 88 F.3d 1511, 1524 (8th Cir. 1996) (finding a parade permit ordinance not narrowly tailed because it applied to

-34-

groups as small as ten persons); <u>Grossman</u> v. <u>City of Portland</u>, 33 F.3d 1200, 1206 (9th Cir. 1994) (invalidating a permit ordinance partly because it applied to single protesters as well as large groups). Given the narrowing interpretation of the regulations that Massport urges here, however, we fail to see how the permit revocation procedure burdens more speech than necessary.

Aside from the possibility of a chilling effect (a possibility that we already have considered and discounted, <u>see</u> <u>supra</u> Part VI(A)), the only burden that the permit revocation provision imposes is on those against whom it is improperly invoked. This means, in practice, that Massport may have significantly more ability to limit large parades or demonstrations than small-scale leafletting. That is more an issue of application than a drafting requirement: Massport is not under any mandate to adopt regulations that, on their face, are specific to each form of expression.

This leaves only the question of adequate alternative modes of communication. NERCC, though ably represented, has made no developed argument that the regulations, as applied to Northern Avenue, leave it without adequate alternative modes of communication. The point is, therefore, forfeited. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990). At any rate, Massport only may revoke permit applications that pose significant safety or access concerns; thus, an application modified to address

those concerns would be approved.  This means, in effect, that the challenged permit-revocation provisions leave open virtually all the means of expression originally available to the applicant.

NERCC has one final string to its bow:  it attacks the "written notice" requirement on the ground that this condition mandates self-identification (and, thus, burdens a leafletter's right to anonymity).  This argument derives from McIntyre v. Ohio Elections Comm'n, 514 U.S. 334 (1995), a case in which the Supreme Court struck down a requirement that individual leafletters identify themselves to the public.  See id. at 357.  Although NERCC concedes that notice requirements have been upheld (at least by implication) in regard to large-scale events, see, e.g., Thomas, 122 S. Ct. at 781; Cox, 312 U.S. at 578, it argues that the regulations here at issue — which encompass even unobtrusive leafletting by one or a few people — sweep too broadly.

McIntyre will not support the weight that NERCC consigns to it.  That case dealt with a public identification requirement for each leafletter, 514 U.S. at 338 & n.3.  Here, however, the regulations contain no requirement that the speaker identify himself; instead, they require only that the event organizer provide contact information to Massport.  This is a meaningful difference.  See Buckley v. Am. Const. Law Found., 525 U.S. 182, 187 (1999) (upholding a registration requirement for paid petition circulators while striking down a "name badge" requirement).

-36-

Moreover, the contact person need not be the progenitor of the proposed speech, but may be an attorney for, or other representative of, the sponsoring organization. This too is a crucial distinction. Because the regulations sub judice do not require the speaker either to disclose his identity or to reveal the source of the speech to the public, we deem McIntyre inapposite.

As a fallback, NERCC sings the praises of Rosen v. Port of Portland, 641 F.2d 1243 (9th Cir. 1981), in which the Ninth Circuit held an advance notice requirement for leafletters not narrowly tailored. Id. at 1252. In reaching this conclusion, the court relied on Thomas v. Collins, 323 U.S. 516 (1945). That decision held unconstitutional a registration requirement for labor organizers, citing the chilling effects of such a requirement. Id. at 538-41.

Collins is not controlling here. That case dealt with labor organizing, not leafletting, and did not imply — nor is there any reason to believe — that a registration requirement burdens leafletters more than it burdens parade organizers or would-be solicitors. See Rescue Army v. Mun. Court of Los Angeles, 331 U.S. 549, 582-83 & n.52 (1947) (indicating that a "mere identification" requirement for the latter activity would be constitutional). Common sense would suggest that concerns over anonymity and the effort required to file the notice would be the same for a parade

organizer as for an organizer of a leafletting event.  If a distinction between the two is to be drawn, it must be made not on the pan of the scales on which burdens are weighed, but, rather, on the pan that weighs the State's interests in notice for each type of activity.  Here, Massport advances a convincing site-specific rationale for the requirement.  This is quite different from Collins, in which the Court confronted a licensing requirement that was not tied to a particular expressive forum, and so could not be justified by any site-specific rationale.[10]  In our view, the Rosen court misapplied Collins — and we therefore decline NERCC's invitation to follow its lead.

Massport insists that the notice requirement allows it not only to allocate security resources properly but also to deal with competing applications for limited space.  Given the physical characteristics of the area and the uses to which it is put, these concerns ring true.  This locale accommodates a significant volume of pedestrian traffic, which, when coupled with the narrow sidewalks and ubiquitous road construction, results in rampant congestion.  Northern Avenue itself is a major thoroughfare, and vehicular traffic is correspondingly heavy.  In light of these idiosyncracies, it appears reasonable for Massport to require

---

[10]While we have grave doubts about the validity of a blanket registration requirement for leafletters anywhere in view of the relatively few problems intrinsic to leafletting, see ISKCON, 505 U.S. at 690 (O'Connor, J., concurring), that issue is not before us today.

advance notice of leafletting events in this location so that security officers may ensure that all leafletters comply with the time, place, and manner restrictions established in the interests of public safety.

That ends this aspect of the case. We find that the challenged regulations meet the narrow tailoring requirement. We therefore uphold them as content-neutral time, place, and manner restrictions insofar as they pertain to Northern Avenue.

## VII. ATTORNEYS' FEES

The Fees Act, 42 U.S.C. § 1988, provides a vehicle for the recovery of attorneys' fees by prevailing parties in cases brought pursuant to 42 U.S.C. § 1983. See, e.g., Lipsett v. Blanco, 975 F.2d 934, 937 (1st Cir. 1992). Despite its failure to obtain a favorable ruling on the merits, NERCC contends that it "prevailed" by pressuring Massport to adopt new regulations, and so should be entitled to reasonable attorneys' fees.

In the district court, NERCC relied on the so-called catalyst theory to support this claim. See New Hampshire v. Adams, 159 F.3d 680, 685-86 (1st Cir. 1998) (delineating that theory and explaining its operation). The Supreme Court thwarted that initiative when it recently consigned the catalyst theory to the scrap heap. See Buckhannon Board & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 601-10 (2001). The Court ruled that a fee-shifting award cannot be made unless there is a

"judicially sanctioned change in the legal relationship of the parties." Id. at 605.

Buckhannon was decided while the district court had NERCC's fee application under advisement. The court considered, sua sponte, whether NERCC could pass the Buckhannon test and concluded that it could not. NERCC now reshapes its argument to suggest that the demands of Buckhannon have been satisfied here because the district court virtually ordered Massport to revise its regulations.

We review a district court's grant or denial of attorneys' fees for manifest abuse of discretion, mindful that the district court has an "intimate knowledge of the nuances of the underlying case." Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001). Such deference is particularly appropriate where, as here, the correctness of the court's decision depends in large part on the proper characterization of its own statements. Cf. Lefkowitz v. Fair, 816 F.2d 17, 22 (1st Cir. 1987) (explaining that "uncertainty as to the meaning and intendment of a district court order can sometimes best be dispelled by deference to the views of the writing judge"). Clearly, the district court is in the best position to determine whether its statements to Massport should be considered as the functional equivalent of a judicial order within the meaning of Buckhannon.

We have carefully examined the transcript of the pivotal proceeding — the hearing held on January 26, 2000. That transcript reveals an extended colloquy in which the district court discussed the possibility of ordering Massport to reduce its regulations to writing and to infuse them with a greater degree of specificity. In the end, however, the court eschewed an order and gave Massport sixty days within which to decide what (if anything) it wished to do, reserving the possibility that the court might enter an order at a later date.

Within the sixty-day period, Massport submitted a revised policy to the court. That policy was the subject of comments by the court and by NERCC's counsel at a hearing held on August 16, 2000. The court then gave Massport a further extension of time to fine-tune its proposal. Massport adopted the new regulations, in final form, on August 28, 2000.

The district court did not compel Massport to adopt the regulations. Under the Buckhannon rule, that ends the matter. Because the district court entered no explicit order compelling, or even leading to, Massport's adoption of the regulations, we cannot say that the district court's refusal to award attorneys' fees constituted an abuse of discretion.

## VIII. CONCLUSION

We summarize succinctly. Because Massport's original permit policy no longer governs Northern Avenue, we dismiss as moot

NERCC's as-applied challenge with respect to the leafletting incident that occurred there. We remand to the district court for consideration of what, if any, other public streets and sidewalks are controlled by Massport; if so, for a determination as to whether the original permit policy still governs those streets and sidewalks; and if so, for an adjudication of the constitutionality of that policy. We caution that nothing contained in our opinion should be construed to preclude the possibility that if the original policy applies to other public sidewalks, that policy may be unconstitutional.

We uphold the district court's finding that the Fish Pier is a non-public forum, and, thus, we affirm the court's determination that the total ban on leafletting in front of the ECC is constitutional. We also uphold, as against NERCC's facial challenge, the permit scheme contained in Massport's newly-revised regulations pertaining to the sidewalks adjacent to Northern Avenue. In that respect, we note that these regulations are content-neutral, vest no excessive discretion in Massport, and constitute a narrowly tailored restriction on speech. Finally, we affirm the lower court's denial of NERCC's application for attorneys' fees, and direct that costs be taxed in favor of Massport.

**So Ordered**.